706 So.2d 518 (1997)
Jewell Warren GILL
v.
Jolie DUFRENE.
No. 97 CA 0777.
Court of Appeal of Louisiana, First Circuit.
December 29, 1997.
*519 Dawn Amacker, Bogalusa, for Plaintiff/Appellee Jewell Warren Gill.
David Cheatham, Bogalusa, for Defendant/Appellant Jolie Dufrene.
Before FOIL, WHIPPLE and KUHN, JJ.
WHIPPLE, Judge.
Jolie Dufrene, the mother of the minor, Taylor Jewell Dufrene, appeals a judgment awarding joint custody of the child to appellant and Jewell Gill, the child's father, and designating Jewell Gill as the domiciliary parent. Finding no error by the trial court, we affirm.

FACTS AND PROCEDURAL HISTORY
Jewell Gill and Jolie Dufrene lived together on two separate occasions in the latter part of 1993, and throughout most of 1994. During this time, Jewell and Jolie conceived a child, Taylor Jewell Dufrene, who was born on March 17, 1995.
While Jewell did not have any contact with Taylor until she was two or three weeks old, he played a significant role in her care over the subsequent seven months. During this seven month period, arrangements for the physical care of Taylor were apparently worked out between Jewell and Jolie, with Jewell having physical custody of Taylor a majority of the time. However, in August of 1995, when Jewell attempted to pick up Taylor after a weekend visitation with Jolie, he learned that Taylor had been placed in the care of Jolie's sister, Michelle Boudreaux. Michelle indicated that Jolie had given her "temporary custody" of Taylor and that Jolie did not want Jewell to have further contact with Taylor. Jewell's attempts to regain physical custody of Taylor resulted in his arrest for "principal to kidnapping."
Thereafter, on September 21, 1995, Jewell filed a petition to establish paternity and for custody of Taylor. On October 4, 1995, a hearing was held; however, no evidence was received by the trial court at that time. Instead, the court issued an interim judgment which ordered that temporary physical custody be shared by Jewell and Jolie, with the parties alternating physical custody every four days, through October 29, 1995, until the court could conduct a full hearing. The interim judgment also ordered that the parties be present with the child while exercising physical custody, except for absence due to work, and refrain from the use of alcohol and illegal drugs while exercising physical custody of Taylor. After a two day evidentiary hearing, on November 28, 1995, and December 4, 1995 ("the first hearing"), the court rendered judgment, decreeing that Jewell was Taylor's father. The judgment did not award legal custody to either party, but only granted the parties "alternate weeks of physical custody." The judgment continued the court's earlier orders, prohibiting alcohol and drug use by the parties, and requiring that the parent exercising custody be present with Taylor. The judgment also ordered the Office of Community Services (OCS) to conduct a home study of both parents and appointed an *520 expert to conduct a custody evaluation and render a report to the court within 60 days of the judgment.
Subsequent to rendition of this judgment awarding alternate weeks of physical custody, but prior to rendition of any judgment awarding legal custody, Jewell filed a motion and order on June 20, 1996, alleging neglect of the child and violations of previous court orders. In the motion, he requested a hearing "for the purpose of updating the court about the events which have occurred affecting the child's welfare since November 28, 1995 and establishing where the parties have resided since November 28, 1995 and plan on residing if granted custody of the minor child." A hearing was conducted on July 31, 1996 ("the second hearing"), during which the court received extensive testimony concerning the parties' lifestyles and living arrangements. The trial court rendered oral reasons for judgment, awarding joint custody and naming the father as domiciliary parent. Appellant was awarded visitation on alternating weekends from 9:00 a.m. on Saturday to 5:00 p.m. on Sunday.
A final judgment in conformity with the oral reasons was eventually signed on October 9, 1996. The judgment included various provisions relating to the child's medical care and treatment, pick-up for visitation, etc. The judgment specifically prohibited drug and alcohol use by the parties while having custody and ordered that Jolie refrain from taking the child at any time to the home of Mark Falgout, a residence where Jolie and Taylor had stayed previously.
Jolie appeals, assigning as error that: (1) the judgment, which purported to award joint custody, actually awarded de facto sole custody to Jewell and, therefore, was an abuse of the court's discretion; (2) granting Jolie such limited visitation was an abuse of the court's discretion; (3) the finding that the Mark Falgout home created a risk of danger to Taylor was manifestly erroneous; (4) the trial court's reliance on appellant's deafness as a basis for its judgment violated constitutional equal protection guarantees; and (5) the designation of Jewell as the domiciliary parent was an abuse of discretion.

LEGAL PRECEPTS
In custody matters, the court shall award custody of a child in accordance with the best interest of the child. LSA-C.C. arts. 131 and 132. If, as in this case, the parents do not agree on custody, the court must award joint custody unless clear and convincing evidence shows that it would be in the best interest of the child to award custody to one parent. LSA-C.C. art. 132; Brown v. Brown, 96-743, p. 3 (La.App. 3rd Cir. 2/26/97); 692 So.2d 458, 459.
In determining the best interest of the child, there must be a weighing and balancing of factors favoring or opposing custody in the respective competing parents on the basis of the evidence presented. Warlick v. Warlick, 27,389, p. 5 (La.App. 2nd Cir. 9/29/95); 661 So.2d 706, 710. Louisiana Civil Code article 134 enumerates twelve non-exclusive factors relevant in determining the best interest of the child.
These factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

*521 (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
LSA-C.C. art. 134.
Where joint custody is awarded, LSA-R.S. 9:335 governs implementation of the joint custody award. Pursuant to LSA-R.S. 9:335(A)(2)(a), the implementation order must assure "frequent and continuing contact with both parents." In furtherance of that goal, physical custody of the child "should be shared equally" to the extent "it is feasible and in the best interest of the child."[1] LSA-R.S. 9:335(A)(2)(b) (emphasis added). This legislation indicates a clear intent to foster an equal sharing of custody when it is feasible and in the best interests of the child. Remson v. Remson, 95-1951, p. 4 (La.App. 1st Cir. 4/4/96); 672 So.2d 409, 412.
In Remson, this court stated that while the best interest of the child remains the paramount concern in custody determinations, that interest must be balanced with a parent's right to equally share the physical custody of the child where feasible.[2]Remson, 95-1951 at p. 4; 672 So.2d at 412; see also Jessen v. Jessen, 97-0287, p. 4 (La.App. 1st Cir. 6/20/97); 697 So.2d 717, 719.
Each child custody case must be viewed in light of its own particular set of facts and circumstances. The trial court is vested with vast discretion in matters of child custody and visitation, and its determination is entitled to great weight and will not be disturbed on appeal unless a clear showing of abuse of its discretion is made. Remson, 95-1951 at p. 4; 672 So.2d at 411.

DISCUSSION
In her first assignment of error, Jolie argues that the award of joint custody, with Jewell as domiciliary parent, was in fact an award of sole custody to Jewell, since Jolie's visitation is limited to two weekends per month. Thus, she asserts, the trial court abused its discretion in making its award, because Jewell did not prove by clear and convincing evidence that an award of sole custody to him was in Taylor's best interest. Additionally, in her second assignment of error, Jolie contends that if the trial court's judgment is to be viewed as a joint custody award, the trial court erred in adopting an implementation plan with such severe limitations on Jolie's visitation with Taylor. She further asserts in her fifth assignment of error that the trial court abused its discretion in designating Jewell as the domiciliary parent.
In reaching its decision regarding custody and visitation, the trial court heard extensive testimony at the two hearings and thoroughly reviewed the evidence in light of the factors set forth in LSA-C.C. art. 134.
The evidence introduced at the hearings establishes that Jolie Dufrene has another child, Peyton, who was approximately two and one-half at the time Jolie became pregnant with Taylor.[3] Jolie completed the eleventh grade and obtained a GED. She was not working at the time of the hearings, relying instead on social security benefits in the amount of $475.00 per month which she receives because of a hearing impairment. *522 However, she stated at the second hearing that she also hoped to start cleaning homes to supplement her income.
Although the record does not fully support Jolie's assertion concerning her living arrangements, Jolie and her mother claimed at the second hearing that Jolie and the two children were living with Jolie's mother and younger sister at their mother's house in Bogalusa.[4]
Regarding Jolie's lifestyle and habits, various incidents were recounted in the record, including her brawling with other women, in one case resulting in an arrest for assault and battery; drinking and drug usage; and relationships with other men.
Additionally, evidence was introduced to demonstrate that Jolie and Taylor stayed on and off at the residence of Mark Falgout. Testimony concerning the Falgout residence indicates that drug deals were being made from the home. While appellant claimed she had only visited the Falgout home for a total of two weeks and had not stayed overnight there, other witnesses reported seeing her and the child sleeping on an egg crate in the house, and noted that her clothing and personal effects were also kept there. Thus, other witnesses refuted Jolie's claim that she and Taylor were not staying at the Falgout residence.
It is also undisputed that during the time Taylor was at the Falgout home, she contracted head lice for which she had to be treated repetitively. Jolie's other child, Peyton, likewise suffered from head lice and eventually had to have his head shaved because of the lice infestation. Testimony was also elicited which established that an infant also died while staying at the Falgout home, possibly from SIDS, and the infant's death was not discovered for at least two hours. The Falgout home was described in detail as a "free house," with many individuals residing therein, by April Crosby, a long-time acquaintance of Jolie. April testified regarding an incident wherein April babysat for Taylor in March of 1996, and Jolie failed to return to pick up Taylor. Instead, Jolie and a friend finally arrived the following morning, rather than the night before as had been promised, to pick up Taylor. April also testified that April's estranged husband was dealing drugs at the Falgout home, and that she had seen people use marijuana and Soma, a muscle relaxer, in the Falgout home. April testified at the second hearing that she had threatened to call OCS to report her brother as well, because his children were staying at the Falgout home and were also infested with lice.
Several witnesses also testified concerning Taylor's serious case of thrush and diaper rash, which developed while she was in Jolie's care. Witnesses also described incidents in which Jolie could not be found after her babysitter, unable to take care of the baby, attempted to find someone else to look after her. On other occasions, Jolie dropped the baby off with friends so she could "go back out to party." Testimony was also adduced which shows Jolie also spent significant periods of time in New Orleans staying with friends or Peyton's father's family.
Jewell Gill, Taylor's father, was twentyseven years old at the time of the second hearing and Jewell was seasonally employed as a pipefitter and welder. The record shows that he had previously received his GED and attended vocational-technical school to learn pipefitting and welding while incarcerated at WCI from November of 1990 to September of 1992, where he was imprisoned for one count of distribution of Ecstasy.
After Jewell and Jolie ended their relationship, Jewell began living with Brandy Landrum. On May 18, 1996, Jewell and Brandy were married, and at the time of the second hearing, were renting a three-bedroom house in Independence, Louisiana. Brandy, twenty years old, attended Southeastern Louisiana University, and was working as a dancer at a men's entertainment club in Baton Rouge to help pay her tuition expenses.
The record shows that Jewell and Brandy kept Taylor approximately seventy-five percent of the time during the week-to-week interim custody arrangement ordered by the court. They took turns feeding and diapering *523 the baby, depending on their work schedules. Brandy took Taylor to receive her immunizations[5] and was primarily responsible for obtaining medical care and treatment for Taylor's cold, diaper rash and thrush.
Jewell testified that Brandy kept the baby during the day while he was at work, and if he was not home when Brandy left for her job in Baton Rouge, Brandy's cousin Shanda would take care of the baby until he got home from work. Brandy customarily would return home about one o'clock a.m., and Jewell would take care of Taylor while Brandy was at work.
After considering the evidence, and analyzing the factors for determining the child's best interest as set forth in LSA-C.C. art. 134, the trial court found that Jolie had not attempted to obtain regular employment or establish a stable lifestyle.
The trial court found that under LSA-C.C. art. 134(4), which obligates the court to consider "the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment," Taylor "had been spending unusual amounts of time in a house that is not environmentally sound," and that Jolie had failed to provide Taylor with a stable, adequate environment in the six months preceding the second hearing.
Considering LSA-C.C. art. 134(5), "the permanence, as a family unit, of the existing or proposed custodial home or homes," the trial court concluded that Brandy and Jewell's marriage and move to a three-bedroom house, as contrasted with Jolie's itinerant lifestyle, provided a more permanent home. Considering "the moral fitness of each party," as set forth in LSA-C.C. art 134(6), the court acknowledged that while Jewell had tested positive for marijuana usage in one of the drug tests ordered by the court, "by the same token there has been quite a bit of testimony as to the mother and her going out." The trial judge expressed concern in his oral reasons for judgment that both parents had failed to follow the court's October 4, 1995 order concerning the parties' use of alcohol or illegal drugs.
The trial court noted that the parties were "equal" under the factors set forth in LSA-C.C. art. 134(7), which requires consideration of "the mental and physical health of each party." However, under LSA-C.C. art. 134(8), which mandates consideration of "the home, school, and community history of the child," the court found that the father had shown, since November of 1995, "he had attempted to establish a good stable home not only for himself but his new wife and apparently for a new child," which the trial court "[didn't] find ... with the mother." Under LSA-C.C. art. 134(10), "the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party," the court concluded that neither Jolie nor Jewell could communicate. Under LSA-C.C. art. 134(11), "the distance between the respective residences of the parties," the court found that "there had been distance all along and that it would continue." Under LSA-C.C. art. 134(12), "the responsibility for the care and rearing of the child previously exercised by each party," the court found that Jolie had been negligent, citing the extensive problems and troubling circumstances present at the Falgout home, the evidence which understandably most concerned the trial court. The court concluded that while Jewell had come into Taylor's life "a little late," he had been caring for her over the course of the previous six months.
In her third assignment of error, Jolie argues that the trial court's factual findings concerning the Falgout residence were manifestly erroneous and, therefore, do not support the award of domiciliary custody to Jewell. We disagree. The evidence overwhelmingly demonstrates that the environment at the Falgout house, where Jolie and Taylor were present for varying amounts of time, was unhealthy. April Crosby, Jewell Gill, and Tim Corkern, Jolie's friend, all testified concerning the death of an infant there. April testified that not only did Jolie's children have head lice, but her own brother's children, who also were staying at the Falgout *524 home, had likewise become infested with head lice. April further testified that she went by the house daily, because of her increasing concern for the welfare of her nephews and therefore could vouch for the deplorable conditions there. The cumulative effect of all of the evidence adequately supports the trial court's findings and conclusions. See Page v. Page, 96-69 (La.App. 3rd Cir. 5/8/96), p. 4; 673 So.2d 1317, 1320.
In further support of her claim that the trial court abused its discretion in rendering its custody award, Jolie argues that the trial court erred by failing to give proper credence to the custody evaluation report made by Charlotte Fornea, the court-appointed social worker who visited Jolie and Jewell in February of 1996 and rendered her report on April 10, 1996. Considering the testimony set forth in the record herein, we find no error by the trial court in rejecting the social worker's recommendations, in view of the extensive and unrefuted testimony indicating that the father had previously provided and could continue to provide a more stable, nurturing and loving environment for his daughter than could the mother. We note that Fornea's report was merely one factor to be considered by the trial court in reaching a decision. Page, 96-69 at p. 4; 673 So.2d at 1320. Additionally, we recognize that the trial judge has the discretion to substitute his common sense and judgment when such a substitution appears warranted upon the record as a whole. Warlick, 27,389 at p. 5; 661 So.2d at 710.
The social worker's findings were negated by testimony at trial which showed that Jewell in fact had been caring responsibly for Taylor, and that Jolie's living arrangements were chaotic and uncertain. The social worker's comment in her report that "[Jolie] has shown responsibility by purchasing a house and making arrangements to have it rebuilt, and by notifying OCS when she felt that her child had been severely neglected," was completely unsupported by the testimony at trial. Likewise, the statement in the report that Jewell's "supervision of Taylor seems inadequate and possibly neglectful" was not borne out by the testimony at the July 31, 1996 hearing. We agree with the trial court that Fornea's statements in the report were insufficient to establish that custody should continue with Jolie. See Freeland v. Pierce, 28,600, p. 4 (La.App.2d Cir. 8/21/96); 679 So.2d 546, 549.
Finally, in her fourth assignment of error, Jolie argues that the trial court erred by relying on Jolie's deafness as a rationale for its ruling, in violation of constitutional equal protection guarantees. We find no merit to this claim. The trial court heard testimony that Jolie turned off her hearing aid at night, with the result that she was unable to hear her child when she cried out, and was unable to use a telephone. Admittedly, these factors may well have influenced the trial court's decision; however, we find no error in the court's consideration of these additional facts in its custody determination. Considering the totality of circumstances, and the ample other evidence of record herein, we find no error in the trial court's conclusion that Jolie should be denied domiciliary custody.
Considering the foregoing, and based upon our review of the record as a whole, we believe that an award of sole custody to Jewell would have been supported by the clear and convincing evidence of record. However, the trial court in fact awarded joint custody, and Jewell does not challenge this award.[6] Thus, despite appellant's claim that the judgment at issue was actually a de facto sole custody award to Jewell, we frame the issue presented herein as a narrow one: whether the trial court abused its discretion in designating Jewell as domiciliary parent and implementing the joint custody award.
Based on the evidence presented, we find no error in the designation of Jewell as domiciliary parent. Moreover, because the record overwhelmingly establishes that equal sharing of physical custody was neither "feasible" nor "in the best interest" of Taylor, we find no error in the trial court's award of visitation to Jolie consisting of alternate weekends.
*525 We note that the instant case is readily distinguishable from the facts presented in Remson, wherein the parents were found to be "two very dedicated and loving parents, both wanting to share their lives with their children." Thus, in Remson, an equal sharing of physical custody was obviously warranted. Remson, 95-1951 at p. 6; 672 So.2d at 413. In contrast, while the trial court herein generously awarded Jolie joint custody of Taylor, we can discern no basis on the record before us for an equal sharing of physical custody at this time.

CONCLUSION
Accordingly, the judgment of the trial court is affirmed. All costs are assessed to appellant, Jolie Dufrene.
AFFIRMED.
NOTES
[1] Prior to amendment by Acts 1995, No. 463, § 1, LSA-R.S. 9:335(A)(2)(b) provided: "To the extent feasible, physical custody shall be shared equally." (Emphasis added). The 1995 amendment to this statute substituted "should" for "shall" and added the phrase "and in the best interest of the child."
[2] The Third Circuit Court of Appeal, in Brown, disagreed with this court's conclusion that that child's interest must be balanced with the parent's right to share physical custody where feasible. The Third Circuit took the position that if the best interest of the child is paramount, it cannot be balanced with the parent's right to equally share custody. Brown, 96-743 at pp. 6-7; 692 So.2d at 461. However, in DeGeorge v. Gilley, 97-387, p. 4 (La.App. 5th Cir. 10/28/97); 701 So.2d 1079, 1081, the Fifth Circuit Court of Appeal cited this court's balancing test with approval, noting that making the best interest of the child the paramount issue simply gives that concern more weight in the balancing of interests.
[3] It is undisputed that Peyton is not Jewell's child and is not involved in this appeal.
[4] While Jolie had previously maintained a separate residence for a short time, at the time of the hearings, she was unable to pay the rent and was no longer maintaining a separate residence.
[5] Brandy testified she learned from the doctor that Taylor was two months behind on the required immunizations because Jolie had not taken her.
[6] Because Jewell has not appealed or answered the appeal seeking a change in the custody award, the judgment cannot be modified in his favor. LSA-C.C.P. art. 2133; Bond v. Allemand, 632 So.2d 326, 332 (La.App. 1st Cir.1993), writ denied, 94-0718 (La 4/29/94); 637 So.2d 468.