PARRO, J.
|2In this child custody case, the mother appeals two judgments in which the trial court granted sole custody of the parties’ minor children to the father and terminated all of the mother’s contact and visitation with them. For the following reasons, we reverse and remand.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
This child custody matter has a long and contentious history. C.M.J. and L.M.C.[1] were married in January 1996 in Orleans Parish. They later established their matrimonial domicile in St. Tammany Parish. Three children were born of the marriage, namely: C.T.J., a boy, born on September 12,1998; J.A.J., a boy, born on September 13, 2001; and J.T.J., a girl, born on March 16, 2007.[2]
On May 27, 2011, C.M.J. filed a verified petition seeking a divorce,[3] pursuant to LSA-C.C. art. 102, and other incidental relief. In his petition, C.M.J. contended that it was in the best interest of the minor children that he be awarded sole custody of the minor children, with specific, supervised visitation awarded to L.M.C. In his petition, C.M.J. claimed that L.M.C. had removed the minor children from the family home on several occasions, without notice to C.M.J., and had denied him access to his children since she left the family home for the final time with the minor children on April 11, 2011. C.M.J. further alleged that L.M.C. had falsely accused him of committing heinous sexual crimes against the parties’ young daughter, J.T.J., in both Jefferson Parish and St. Tammany Parish.[4] Because of the alleged abuse, L.M.C. took J.T.J. to the Children’s Hospital in New Orleans for an intimate examination, as well as a forensic evaluation at the Children’s Advocacy Center in New Orleans. According to C.M.J., L.M.C. has attempted to alienate the minor children from him and has encouraged inappropriate behavior | (¡between the older two children, who are boys, and the parties’ daughter.[5] C.M.J. further contended that L.M.C. had falsely accused him of drug *579 ging her and the minor children on more than one occasion. Finally, in the alternative, C.M.J. contended that, if the parties were awarded joint custody, he should be designated as the domiciliary parent.
In June 2011, C.M.J. filed an amended petition, alleging that, since April 11, 2011,[6] L.M.C. had ignored all of C.MJ.’s repeated requests through written correspondence, voice mail, electronic mail, and text message, to have access to, or to speak to, his minor children. C.M.J. further alleged that the school attended by the minor child, J.A.J., had recommended that J.A.J. receive a psycho-educational evaluation and vision screening over the summer vacation and further recommended that his parents discuss the possibility of his being retained in his current grade level next year. According to C.M.J., L.M.C. had not taken any steps to provide the evaluation or the vision screening for J.A.J. Therefore, C.M.J. contended that the minor children would suffer immediate and irreparable harm before L.M.C. could be heard in opposition if the minor children were not placed in the temporary custody of C.M.J., with L.M.C. awarded specific, supervised visitation. On June 17, 2011, the trial court granted C.M.J.’s motion, awarding him temporary custody of the minor children, with L.M.C. granted visitation with the children every Monday from 9:00 a.m. until Thursday at 6:00 p.m. C.M.J. also filed an application for ex parte order of temporary custody and a motion and order for civil warrant, ordering the St. Tammany Parish Sheriffs department to return the minor children to his custody.[7] An expedited hearing on the issue of temporary custody, as well as C.MJ.’s request for mental health evaluations of the parties, was scheduled for July 7, 2011.
On June 21, 2011, L.M.C. filed a petition for protection from abuse, alleging that C.M.J. had physically abused her and the minor children and that he had sexually Labused J.T.J. The petition alleged specific incidents of abuse in 2009 and 2010, with the most recent incident having occurred on April 5, 2011. L.M.C. sought an ex parte temporary restraining order, prohibiting C.M.J. from abusing, harassing, stalking, following, or threatening her or the minor children in any manner whatsoever.[8] The request for a temporary restraining order was denied, and the petition was set for hearing on July 7, 2011, the same date as the hearing on temporary custody.
On June 21, 2011, L.M.C. filed an answer and reconventional demand to C.MJ.’s original petition in this matter. L.M.C. denied the allegations of the original petition and alleged that C.M.J. had molested four-year-old J.T.J. She further contended that it was in the best interest of the minor children that she be awarded sole custody of the children, with C.M.J. to be granted supervised visitation. In addition, L.M.C. stated that the 22nd Judicial District Court had initiated an investigation into the alleged abuse. Upon her request, the trial court issued a temporary restraining order against C.M.J., restrain *580 ing and enjoining him from harassing L.M.C.[9]
On the same date, L.M.C. also filed an answer to C.MJ.’s amended petition and an ex parte reconventional demand, seeking to annul the emergency custody decree and civil warrant issued in favor of C.M.J. Again, L.M.C.’s answer simply denied the allegations of the amended petition. In her reconventional demand, L.M.C. requested that the June 17, 2011 order granting temporary custody to C.M.J. be declared null and void pursuant to LSA-C.C.P. art. 3945(E) and that the minor children be returned to her, because C.M.J. had failed to present facts substantiating his allegation that the minor children would suffer immediate harm before L.M.C. could be heard in opposition to his request for immediate custody.
On July 7, 2011, the parties came before the trial court for a scheduled hearing [fion numerous matters.[10] However, the parties reached a compromise on certain issues and read the stipulations into the record. On August 15, 2011, the trial court signed a written judgment in accordance with these stipulations and the judgment rendered on the record at the hearing. Pursuant to the judgment, the parties and the minor children were to submit to, and cooperate in, a sexual abuse evaluation conducted by Dr. Alicia Pellegrin, who was also to conduct mental health evaluations in accordance with LSA-R.S. 9:331. The judgment required the parties to submit drug and urine tests administered by the 22nd Judicial District Court.[11] In addition, the judgment provided that the parties were to share joint custody of the children, with neither party designated as the domiciliary parent and with the parents sharing physical custody on a two-week rotation.[12] Furthermore, the judgment specifically provided:
There shall be no sharing of allegations or anything about this case with the children. Neither party shall denigrate, nor allow anyone else to denigrate, the other parent or their family in the presence or hearing of the minor children. This prohibition does not apply to the children talking to law enforcement officers or child protection workers in an investigation in this matter, or from talking to or being examined by court appointed mental health professionals.
The [parties] shall not initiate any conversations with the minor children or speak inappropriately with them, even *581 following up on questions they have. The parties shall not say anything to the minor children about this custody proceeding other than everything is going to be all right in the end; and No one, including family members, shall discuss the supposed alleged allegations with the minor children outside of the Court, the official investigation, child protection, the court appointed mental health professionals, or the minor child [J.T.J.’s] counselor, if that counselor has the appropriate credentials.[13]
|BThe judgment also provided that L.M.C.’s petition for protection from abuse was dismissed, without prejudice.
On July 12, 2011, L.M.C. filed an amended and supplemental answer to C.M.J.’s petition for divorce.[14] This amended and supplemental answer provides additional allegations of sexual abuse of J.T.J. by C.M.J., which allegedly occurred in October and November 2010, as well as in March 2011. In addition, the pleading contains allegations of physical abuse by C.M.J. of C.T.J., the parties’ oldest son, between March and September of 2009, as well as physical abuse of L.M.C. herself. L.M.C. also filed a second petition for protection from abuse on July 18, 2011; however, this petition subsequently was dismissed on her own motion.
On October 25, 2011, L.M.C. filed a motion for emergency ex parte custody and injunction, requesting that she be awarded sole temporary custody of the minor children, without an award of visitation to C.M.J., because immediate and irreparable injury may result to the children before a hearing could be held. According to the motion, on October 19, 2011, J.T.J. complained to L.M.C. that her father had hurt her rear end. L.M.C. then took J.T.J. to Children’s Hospital in New Orleans, where she underwent a medical examination. According to the notes from the assessment portion of this examination, which were attached as “Exhibit A” to the motion, J.T.J. provided a clear and detailed history of sexual abuse by her father, more than one time involving penile-vaginal contact. J.T.J. stated that he used lotion during the abuse, and she indicated that she felt sad. She further stated that she does not feel safe with him, and she thinks that he is mean. As a result of this examination, it was recommended that the other children also be evaluated. The assessments of those children also found that they had given clear and detailed reports of having witnessed domestic abuse on more than one occasion and that they felt afraid and unsafe with their father. In addition, C.T.J. provided a history of experiencing physical abuse by his father, including being choked, punched, and hit with a belt.
|7The above motion was presented to the trial court, which signed it after intervention from the Department of Children and Family Services (DCFS). Thus, L.M.C. was granted temporary sole custody, pending a hearing scheduled for November 7, 2011.[15] On that date, the parties consented to an interim order, which granted L.M.C. temporary sole custody of the minor children and enjoined C.M.J. from harassing L.M.C. and from coming within *582 100 yards of her or the minor children. The interim order further provided that C.MJ.’s right to request supervised visitation was reserved to him. Finally, the order noted that it was entered into by agreement of the parties, with no admission or showing of good cause.
C.M.J. later discovered that L.M.C. had videotaped herself discussing the abuse allegations with J.T.J. on October 4, 2011. In addition, L.M.C. had apparently allowed her sister, Donna Saacks to record herself discussing certain allegations with J.A.J. Both of these recordings were made in alleged violation of the judgment rendered on July 7, 2011.[16] Therefore, C.M.J. filed a rule for contempt and motion in limine, in which he sought to have L.M.C. held in contempt for her part in making and/or condoning the making of these recordings. In addition, pursuant to the motion in li-mine, C.M.J. sought to have L.M.C. prohibited from introducing into evidence, or using in any manner: (1) the recordings of the minor children made in alleged violation of the judgment rendered on July 7, 2011; (2) any testimony that had been exposed to, or influenced by, the recordings; and (3) any statements made by, or to be made by, the minor children concerning the allegations in this matter.
On June 6, 7, and 8, 2012, the trial court conducted hearings on C.MJ.’s rule for contempt and motion in limine, as well as the initial hearings on competing rules for sole custody and child support filed by each of the parties.[17] At the end of the first day of hearings, the trial court found L.M.C. guilty of two counts of contempt of court for violating the provisions of the judgment rendered on July 7, 2011. Specifically, L.M.C. |Rwas found to have violated the judgment by discussing the allegations of the matter with J.T.J., when she videotaped her conversation with J.T.J. on October 4, 2011, and also when she allowed her sister to denigrate C.M.J. to J.A.J. by allowing her to record and interrogate the child. L.M.C. was sentenced to thirty days imprisonment in parish jail on each count of contempt of court; however, the sentence was suspended, and L.M.C. was placed on unsupervised probation for sixty days. L.M.C. was further ordered to pay $250 per count of contempt of court to the Judicial Expense Fund of the Twenty-Second Judicial District Court for a total of $500.
The trial court next addressed C.M.J.’s motion in limine. At the hearing, the trial court heard testimony from Dr. Pellegrin, the clinical psychologist appointed by the trial court to perform sexual abuse and custody evaluations, and Anne Troy, a pediatric nurse practitioner who worked at Children’s Hospital in New Orleans and examined J.T.J. and the other minor children. Thereafter, the trial court ruled in open court that L.M.C was prohibited from using the recordings of the minor children in any manner or from using any testimony in conjunction with those recordings in the trial based on the inherent unreliability and untrustworthiness of the recordings. The other issues raised in the motion in limine, including the question of whether the children would be allowed to testify at the trial, were referred to the trial of the merits.[18]
*583 Finally, the matter went to trial on the issue of custody. After multiple hearings over a span of several months, the trial court took the matter under advisement. On February 1, 2013, the trial court issued an order requiring the parties to appear in court on February 8, 2013, at 3:00 p.m. to receive the court’s ruling on custody. The trial court’s order further provided that the minor children were to be brought to court on the same date and time, to meet with the court’s social worker. L.M.C. filed a motion seeking to have the meeting between the social worker and the minor children recorded.
|9On February 8, 2013, the trial court issued lengthy written reasons for judgment, in which it determined, among other things, that L.M.C. had mentally and physically abused the children by making false allegations of sexual and physical abuse against C.M.J. and by manipulating the children to make false allegations against their father over a long period of time. Accordingly, the trial court awarded sole custody of the minor children to C.M.J. and denied L.M.C. any visitation with the minor children until certain conditions were met.[19] Once L.M.C. was informed that she was losing custody of, and all contact with, her children, she and her attorney were required to leave the courthouse, and L.M.C. was not allowed to say goodbye to her children, despite the fact that the children had been in her sole custody since October 2011.[20] On February 19, 2013, the trial court signed two judgments in accordance with these written reasons. The first judgment addresses only the custody issue and granted C.M.J. sole custody of the minor children. The second judgment, which addressed additional issues such as L.M.C.’s visitation, was subject to a protective order and prohibited the disclosure and/or dissemination of the second judgment and the written reasons for judgment. It is from these judgments that L.M.C. has appealed.
RELEVANT LAW
In the absence of an agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent. LSA-C.C. art. 132. To the extent it is feasible and in the best interest of the child, physical custody of the child should *584 be shared equally. LSA-R.S. 9:335(A)(2)(b).
The primary consideration in a child custody determination is always the best | minterest of the child. See LSA-C.C. art. 131. Louisiana Civil Code article 134 mandates consideration of all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and their other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The best interest of the child test under LSA-C.C. arts. 131 and 134 is a fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case. Romanowski v. Romanowski 03-0124 (La.App. 1st Cir.2/23/04), 873 So.2d 656, 659; Street v. May, 35,589 (La.App. 2nd Cir.12/5/01), 803 So.2d 312, 315. Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved, with the paramount goal of reaching a decision that is in the best interest of the child. Romanowski, 873 So.2d at 659. The trial court is vested with vast discretion | nin matters of child custody, and its determination is entitled to great weight and will not be disturbed on appeal, unless a clear showing of abuse of its discretion is made. Gill v. Dufrene, 97-0777 (La.App. 1st Cir.12/29/97), 706 So.2d 518, 521.
Moreover, it is well-settled that a court of appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Accordingly, appellate review of the factual circumstances and evidence of the case will not be the basis for reversal of the trial court’s judgment, in the absence of manifest error, even if the court of appeal is convinced that, had it *585 been sitting as the trier of fact, it would have weighed the evidence differently. See Rosell, 549 So.2d at 844. If the factual findings are found to be reasonable and supported by the record, the trial court’s determinations must be given much discretion, especially in regard to the credibility of 'witness testimony, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, 549 So.2d at 844.
However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735. A legal error occurs when a trial court applies incorrect principles of law, and such errors are prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Id.
| ^DISCUSSION
In her first assignment of error, L.M.C. contends that the trial court erred as a matter of law and abused its discretion in not allowing the three minor children to testify at the custody trial regarding the allegations of physical and sexual abuse. Specifically, L.M.C. argues that the trial court abdicated its determination of the credibility of the children to Dr. Pellegrin, the court-appointed custody evaluator.
Every person of proper understanding is competent to be a witness, except as otherwise provided by legislation. LSA-C.E. art. 601. Furthermore, the question of a person’s competency to be a witness shall be determined by the trial court. See LSA-C.E. art. 104. The determination by the trial court that a child is competent to testify as a witness is based not only upon the child’s answers to questions testing his understanding, but also upon the child’s overall demeanor on the witness stand. State in Interest of D.M., 97-0628 (La.App. 1st Cir.11/07/97), 704 So.2d 786, 791. The determination as to whether a child has sufficient understanding to testify is entitled to great weight, because the trial court has the advantage of seeing and hearing the witness. Therefore, the trial court is vested with wide discretion in determining the competency of child witnesses; and on ap-, peal, its ruling is entitled to great weight and will not be disturbed in the absence of manifest error. Id.
In this case, L.M.C. listed the children as potential witnesses in the custody proceeding; however, C.M.J. attempted to prohibit the children from testifying, contending that their testimony had been contaminated and was unreliable due to the actions of L.M.C. and others in interviewing the children about the allegations of abuse.[21] At the end of L.M.C.’s case, when it was time for the children to testify, the trial court ruled in open court that *586 the children would not be allowed to testify in the custody trial.
In so ruling, the trial court stated:
[L.M.C.,] through her counsel[,] requests that all three of the minor | , (¡children be allowed to testify in this matter[,] basically in support of her position. She claims that the children are the ultimate fact witnesses in the case for the court to determine whether the children have been physically or sexually abused by their father. She further states that she is facing loss of custody and contact with the children and that she is entitled to procedural due process safeguards in which she is allowed to call witnesses in her defense.
[C.M.J.] opposes this request. As part of his contention[,] he alleges that any testimony elicited from the children is contaminated; therefore, they should not be allowed to testify. He relies on the opinion of Dr. Alicia Pellegrin, the court appointed mental health expert, for support that the minor children have been subjected to suggestibility and contamination by the mother and her family. Whether the minor children are allowed to testify [is] a determination within the discretion of the court.
This case presents a unique set of facts for consideration by the court in determining whether these children are competent witnesses to testify.
In this case, the court made a factual finding of contempt against [L.M.C.] for discussing the allegation at issue in this case with the minor child, [J.T.J.] The court further found that [L.M.C.] allowed her sister to record and interrogate the minor child, [J.A.J., and] also to denigrate the father in his presence.
These recordings evidence the questionable practices by the mother to influence the children regarding the facts of this case and, more specifically, the impressions of the children in relation to their father. The recordings obtained in both of these instances were excluded from evidence in connection with the custody trial due to their inherently unreliable and untrustworthy nature.
Dr. Pellegrin cites numerous concerns in her testimony regarding the contamination and suggestibility of these children and the harmful effects it will have on the children to inject them in the custody proceeding. The court recognizes the fact that all of these children have been questioned repeatedly in connection with the allegations in the case by many individuals. These include the mother, her family, law enforcement, child protection, mental health evaluator, the staff at Children’s Hospital, and finally by their own siblings.
Further, some of the interviews of the children were conducted by untrained individuals that did not have the skill or the expertise that is absolutely necessary to conduct a proper forensic interview of children that would be reliable[,] and most disturbingly, some of the individuals have a personal interest in the outcome of this litigation and believe and have testified that at the time of the interviews they absolutely believed the father had abused the children.
For those reasons, the court finds that any testimony presented to the court from any of these children is tainted. And there would be no purpose in allowing them to testify in front of the court at this time. Their testimony, in the court’s opinion, would not be reliable and not trustworthy, based on the above. That is the court’s reason that the children will not be allowed to testify.
We find that the reasons stated by the trial court are an abuse of its discretion and are insufficient as a matter of law to support its decision to prohibit the chil *587 dren from testifying in this custody proceeding.
The trial court correctly noted that the determination of whether the children 114would be allowed to testify was within its discretion. However, as the jurisprudence clearly states, this wide discretion is granted to the trial court because it is assumed that the trial court is in a superior position to observe and evaluate the demeanor of the witnesses. State in Interest of D.M., 704 So.2d at 791; State v. Linson, 94-0061 (La.App. 1st Cir.4/7/95), 654 So.2d 440, 444, writ denied, 95-1120 (La.9/22/95), 660 So.2d 470; State v. Allen, 26,547 (La.App. 2nd Cir.12/7/94), 647 So.2d 428, 438, writ denied, 95-0048 (La.5/19/95), 654 So.2d 1352. While trial courts have been allowed to rely on the expert testimony of clinical psychologists in determining the competency of child witnesses, such testimony has been only one part of the evidence relied upon by the trial court, and the trial court has always had the opportunity to observe the child’s demeanor, a factor of great importance in determining the child’s understanding. See State v. Troulliet, 94-183 (La.App. 5th Cir.9/14/94), 643 So.2d 1267, 1270-71; State v. Gordon, 463 So.2d 665, 668-69 (La.App. 4th Cir.1985).
In contrast with the cited cases, the trial court in this case never observed the demeanor of the minor children in person; rather, the trial court relied exclusively on the observations and evaluations of Dr. Pellegrin in determining that the children’s testimony had been contaminated.[22] Because of the trial court’s failure to rely on its own observations of the children, we find that the trial court abused its discretion and erred as a matter of law.
Furthermore, we find several problems with Dr. Pellegrin’s testimony in this matter. The trial court appointed Dr. Pelleg-rin to perform a sexual abuse evaluation in these proceedings. However, at the hearing on the motion in limine, Dr. Pellegrin testified that she had not performed a sexual abuse evaluation, insisting that she had hfjOnly been appointed to perform a custody evaluation.[23] However, a reading of the trial court’s judgment clearly demonstrates that Dr. Pellegrin was primarily appointed to perform a sexual abuse evaluation. She was also tasked with performing a mental health evaluation in accordance with LSA-R.S. 9:331, unless she thought it would be more appropriate for a different mental health professional to conduct those evaluations. The judgment further provided that, if she believed a different mental health professional should perform the mental health evaluations, she was required to inform the court and rec *588 ommend a mental health professional to perform those evaluations.
Dr. Pellegrin further testified that she had not performed the court-ordered sexual abuse evaluation, nor had she performed a forensic child sexual abuse interview with the child, because she believed that any information she could have obtained from J.T.J. would be highly suspect. According to Dr. Pellegrin, this contamination was due to the fact that, by the time she was able to interview J.T.J., she had already been questioned by her mother regarding the allegations. Therefore, Dr. Pellegrin stated that there was no longer any way to know whether the child had been sexually abused. Interestingly, although Dr. Pellegrin first claimed that she had never been appointed to perform a sexual abuse evaluation and then attempted to place the blame for her failure to perform the required evaluation on the mother’s efforts to discuss the abuse allegations with J.T.J., she later acknowledged that she would “never do a child sexual abuse interview with a child that’s had multiple interviews, whether with family, or OCS, or the police.” Thus, it appears that Dr. Pellegrin had decided even prior to conducting any interviews with any member of this family that she would be unable to complete a sexual abuse evaluation in this matter and that she could not offer any opinion as to whether this child had been abused, due to the fact that there was an ongoing investigation into the abuse and J.T.J., had already been interviewed by others.
It is difficult to imagine a scenario in which allegations of child sexual abuse have been made and the child’s first interview would be with a court-appointed psychologist 11fiin a child custody proceeding, rather than with the police, hospital personnel, OCS, or even a family member, who would often be the initial outcry witness to the abuse.[24] Furthermore, it is well-known and documented that sexual abuse of children is extremely difficult to detect, because “the offense often takes place in secret, the victim is young, vulnerable, and reluctant to testify, and there is often no physical or other evidence the abuse took place.” Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040, 1047, quoting State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, 962. The evidence is rarely direct, but is circumstantial. Folse, 738 So.2d at 1047. Since the primary consideration in custody proceedings is the best interest of the child, and since the purpose of unearthing the truth concerning allegations of child sexual abuse would serve to help, rather than hinder that goal, it seems counter-productive to ignore allegations of abuse simply because the child had been interviewed by others before the court-ordered sexual abuse evaluation could be performed.[25]
Regardless, Dr. Pellegrin had been appointed to perform a sexual abuse evaluation by the court. If she did not believe she could do so, it was incumbent upon her to inform the court so that a new evaluator could be appointed. Thus, the trial court’s reliance on the opinions of Dr. Pellegrin, which were not supported by the appropriate court-ordered evaluation, is an abuse of discretion. Accordingly, we remand the matter to the trial court for a new custody trial, including a determination of whether *589 the minor children are allowed to testify at this new trial.
In her second assignment of error, L.M.C. contends that the trial court erred in refusing to allow the testimony of the children’s maternal grandmother regarding J.T.J.’s initial disclosure of sexual abuse to her. According to L.M.C., this testimony should have been allowed to demonstrate the child’s first clear reports of abuse, as well as the absence of any changes in her story since the interviews that had allegedly tainted or contaminated her ability to testify.
Louisiana Code of Evidence article 804 provides, in pertinent part:
|)7A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
[[Image here]]
(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness, infirmity, or other sufficient cause;
[[Image here]]
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(5) Complaint of sexually assaultive behavior. A statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint of sexually assaultive behavior.
In this matter, the trial court determined that J.T.J. was unavailable as a witness when it found that she was prohibited from testifying in the custody proceeding. It then allowed L.M.C.’s mother, V.C., to testify regarding J.TJ.’s initial disclosure of sexual abuse, which was made to her. However, according to L.M.C., the trial court did not allow V.C. to testify about the complete disclosure made to her by J.T.J. After a review of the record, we agree with L.M.C.
V.C. testified that she was playing with J.T.J. one day in 2010, when she began swinging her around and tickling her. V.C. stated that when she tickled her in the thigh area, J.T.J., had fear on her face and said, “The bleed. The bleed.” When V.C. tried to testify further into what else J.T.J. said, counsel for C.M.J. objected, contending that LSA-C.E. art. 804(B)(5) only allowed the initial complaint of sexually assaultive behavior in evidence, but not any subsequent complaints. Counsel for L.M.C. denied that this statement was the initial complaint of sexually assaultive behavior, stating that this incident was simply offered as context for the initial complaint; however, the trial court sustained the objection, and no further testimony on the issue was allowed.
Counsel for L.M.C. then proffered V.C.’s deposition, which contained her entire testimony about the alleged disclosure. According to the deposition, the next time V.C. saw J.T.J., the child told her grandmother that her father was taking her from her bed |18at night and abusing her.[26] Pursuant to LSA-C.E. art. 804(B)(5), this testimony should have been admitted.
Article 804(B)(5) authorizes an individual who has received the initial complaint of *590 sexually assaultive behavior from a victim under the age of twelve to testify regarding that complaint, if the victim is unavailable to testify. In this matter, the alleged victim of the sexual assault, J.T.J., was determined to be unavailable when the trial court prohibited her from testifying in the custody proceeding. The trial court then correctly allowed V.C. to testify regarding the initial complaint of sexually assaultive behavior allegedly made to V.C. by J.T.J.; however, the trial court incorrectly ruled that the only statement V.C. could testify about was a statement in which J.T.J. made no clear mention of sexually assaultive behavior.
Despite the objection by counsel for L.M.C. that J.TJ.’s statement, “The bleed. The bleed.” was not the initial complaint of sexually assaultive behavior, the trial court refused to allow V.C. to testify further. Nevertheless, it is only the statements that follow, when J.T.J. stated that she was subjected to penile-vaginal contact, that fall within the exception provided by LSA-C.E. art. 804(B)(5), as those are the only statements that actually reveal a complaint of sexually assaultive behavior. Thus, it is those comments that the trial court should have allowed. Accordingly, we find that the trial court erred in not allowing V.C. to testify concerning J.TJ.’s initial complaint of sexually abusive behavior.[27]
|1flDECREE
For the foregoing reasons, we reverse the trial court’s judgments and remand this matter to the trial court for a new trial consistent with this opinion.[28] We further note that a sexual abuse evaluation has yet to be performed as required by the trial court’s judgment signed August 15, 2011. However, considering Dr. Pellegrin’s reluctance to perform such evaluations when the children have been interviewed multiple times, we order the trial court to appoint a different psychologist to perform the sexual abuse evaluation.[29] Accordingly, the trial court is instructed to appoint a new psychologist to perform the sexual abuse evaluation within thirty days of the rendering of this opinion.
In addition, we find that it is in the children’s best interest that the parents share joint custody of the children pending the re-trial of these proceedings, with neither party designated as the domiciliary parent. The parties shall share physical custody of the children on a week-to-week basis, with the children being delivered to the non-custodial parent by Sunday evening at 6:00 p.m. each week. It is this court’s understanding that L.M.C. has not had custody of her children since February 8, 2018, the date of the trial court’s reasons for judgment in this matter. Accordingly, she will be granted physical custody of the *591 minor children immediately upon the rendering of this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
GUIDRY, J., concurs in the result.

. L.M.C. apparently took her husband’s last name when she got married, and she is referred to throughout the record and in the briefs as using her married name. However, for ease in differentiating the parties, we will use initials referring to her maiden name throughout this opinion.

. The children are referred to by their initials to preserve their anonymity in this confidential proceeding.

.The parties were ultimately divorced by a judgment signed on July 20, 2012.

. At the time the accusations were made in Jefferson Parish, J.T.J., was three years old. J.T.J. was four years old when the abuse allegedly occurred in St. Tammany Parish.

. C.M.J. contended that, on numerous occasions, L.M.C. had paid the older boys $5 to bathe and dress their sister. C.M.J. stated that he believed this was inappropriate and insisted that it stop.

. April 11, 2011, was the date that L.M.C. allegedly removed the children from the family home without warning to C.M J.

. Despite this civil warrant, the children were not turned over to C.MJ.’s custody.

. L.M.C. further requested that the temporary restraining order prohibit C.MJ. from: (1) contacting her or the minor children personally, electronically, by phone, in writing, or through a third party, without the express written permission of the court; and (2) going within one hundred yards of the residence, apartment complex, or multiple family dwelling where L.M.C. and the minor children reside.

. The issues raised in this pleading were set for hearing on July 11, 2011, before the hearing officer, and on October 11, 2011, before the trial court.

. According to the minute entry, the following matters filed on behalf of C.M.J. were to be addressed at this hearing: (1) rule for temporary custody and evaluation; (2) rule for contempt; (3) rule for additional custody; (4) rule to register current address and information; and (5) exception to ex parte recon-ventional demand. In addition, the minute entry lists the following matters filed on behalf of L.M.C., which were to be addressed at the hearing: (1) rule to declare temporary custody null and void; (2) rule to return the minor children; and (3) petition for protection from abuse.

. Although the judgment was not signed until August 15, 2011, the parties were ordered to submit to the drug testing on July 8, 2011, which was the day after the hearing.

. Specifically, the judgment noted that the parents were to share the children on a 4/3 split during that two-week rotation, so that, in week one, L.M.C. would have the children from Monday at 9:00 a.m. until Thursday at 6:00 p.m. C.M.J. would then have the children from Thursday at 6:00 p.m. until the following Monday at 9:00 a.m. In week two, L.M.C. would have the children from Monday at 9:00 a.m. until Friday at 6:00 p.m. C.M.J. would then have the children from Friday at 6:00 p.m. until Monday at 9:00 a.m., when the schedule would revert to that of week one.

13. A review of the transcript of this hearing demonstrates that these provisions were not stipulated to by the parties; rather, the trial court imposed them as part of the ruling.

. The pleading refers to itself only as an amended and supplemental answer; however, it is clearly an attempt to amend the previous reconventional demands filed by L.M.C. The trial court signed an order authorizing the amendment on July 17, 2011.

.There is no signed order in the record; however, it is undisputed that the order was signed.

. The judgment was rendered on July 7, 2011, and was signed on August 15, 2011.

. At this hearing, the trial court also considered C.MJ.’s rule for mental health evaluations and L.M.C.'s rule to terminate C.M.J.’s visitation, her rule to maintain health insur-anee, and her rule for interim spousal support.

.On December 26, 2012, the trial court signed a judgment in accordance with this ruling, which had been rendered in open court on June 7, 2012. The judgment specifi *583 cally provided that L.M.C. was prohibited from "introducing into evidence, referring to, using in any manner, or offering any testimony in conjunction therewith, any recordings of the minor children the parties made in violation of the [Consent Judgment of July 7, 2011.]” The written judgment also provided that the minor children would not be allowed to testify in the custody proceedings; however, that part of the ruling had not been made until December 5, 2012, near the end of the custody trial.

. While the parents were advised of the trial court’s ruling, the children were sequestered in a separate area of the courthouse. Although the trial court’s order had stated that the children were to have a meeting with the court’s social worker, no such meeting was held. According to the transcript of the hearing, the trial court stated that it had intended to have the social worker made available to the children in their best interest and in an effort to make things easier on the children. However, in light of L.M.C.’s motion to have the session recorded, the trial court determined, without discussion, that the children would not speak to the social worker that day.

. Since the children had been placed in L.M.C.’s sole custody, C.M.J. had been granted the right to seek supervised visitation with the children; however, C.M.J. had not sought any visitation with his children since October 2011, alleging that L.M.C. had made him afraid to be around his children.

. As noted previously, this was one of the issues raised in the motion in limine, which was tried just before the custody trial. Although the trial court ruled after that hearing that the recordings of the children were inadmissible in the custody proceedings, it decided to reserve ruling on the remaining issues, including whether the children would be allowed to testify in these proceedings until the trial on the merits.

. The trial court also referenced the recordings of the children made by L.M.C. and her sister; however, these recordings are not in evidence for any purpose other than as evidence at the contempt hearing. L.M.C. was sanctioned for her contempt already; therefore, it was improper to sanction her further for her contempt by prohibiting the children from testifying at the custody proceedings. Furthermore, the question of whether a child's testimony has been coached is simply one factor to be considered in determining whether a child is competent to testify. See State v. Atkins, 97-1278 (La.App. 4th Cir.5/27/98), 713 So.2d 1168, 1175. In addition, the fact that the testimony may be "coached” is not enough in itself to dictate the exclusion of the child's testimony, when traditional courtroom methods of cross-examination, proper instruction of the witness and the attorney, and proper objections by the opposing side are better ways to deal with potentially "coached" testimony. See State v. Armstrong, 453 So.2d 1256, 1260 (La.App. 3rd Cir. 1984).

. Counsel for L.M.C. objected to Dr. Pelleg-rin’s testimony because she had not performed the sexual abuse evaluation as ordered. His objection was overruled.

. The initial allegations that C.MJ. had sexually abused J.T.J. were made in Jefferson Parish, long before this divorce proceeding was filed in St. Tammany Parish.

. Dr. Pellegrin herself acknowledged during her testimony that it is rare, if ever, that a sexual abuse case presents itself in which everything is handled perfectly and nobody questions the child inappropriately.

. According to the deposition, J.T.J. told her grandmother that her father would “put his pookie in her pookie.” It was established in other testimony that J.T.J. was referring to penile-vaginal contact when using this description.

.We pretermit the remaining assignments of error at this time because of our rulings in the first two assignments of error. However, we note that in the trial court’s reasons for judgment, it again made reference to the recordings of the children as support for its ruling on the merits, even suggesting that any review of this matter should begin with an examination of these recordings. As noted previously, those recordings were introduced solely for the purposes of the hearing on L.M.C.'s contempt, and, as the trial court acknowledged, they were excluded from evidence on the trial of the merits. Accordingly, it was improper for the trial court to refer to them as evidence in support of its decision on the merits.

. Since we have reversed both judgments, the trial court’s protective order is no longer in effect. We note that neither party filed a motion to seal the record or a motion for a protective order in this court.

. L.M.C. has requested that we remand this matter to a different trial judge; however, we note that no motion to recuse has been filed at the trial court level.