STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2021 CU 0277

JASON M. UNDERWOOD

VERSUS

LEIGH A. UNDERWOOD

JUDGMENT RENDERED: _____OCT 2 1 2021_____

* * * * * * *

Appealed from
The Family Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number F190623 • Division B

The Honorable Lisa Woodruff-White, Presiding Judge

* * * * * * *

Erik R. Noland
Felix A. Dejean, III
Baton Rouge, Louisiana

COUNSEL FOR APPELLEE
PLAINTIFF—Jason M. Underwood

Namisha D. Patel
Roy H. Maughan, Jr.
Joshua D. Roy
Baton Rouge, Louisiana

COUNSEL FOR APPELLANT
DEFENDANT—Leigh A.
Underwood

* * * * * * *

BEFORE: McCLENDON, WELCH, AND THERIOT, JJ.

**WELCH, J.**

In this contentious child custody proceeding, Leigh A. Underwood (now "Texada"[1]) appeals a judgment that, among other things, modified the joint custodial arrangement between her and Jason M. Underwood by dividing the domiciliary parent decision-making authority between them, determined child support and related expenses, and found Mrs. Texada in contempt of court. For reasons that follow, we amend the judgment of the trial court, and, as amended, the judgment is affirmed.

## I. FACTUAL AND PROCEDURAL HISTORY

Mrs. Texada and Mr. Underwood were married on December 17, 2011, and they had one child during their marriage, J.M.U., Jr. On June 23, 2013, when the child was approximately 9 ½ months old, the parties separated; four days later, June 27, 2013, Mr. Underwood filed a petition for divorce. Since that time, there has been extensive litigation between the parties concerning child custody, including matters incidental to child custody, which has resulted in the rendition of several interim judgments, three considered decrees/judgments, and one stipulated judgment. At issue in this appeal is the third considered decree, which was the result of several original, supplemental, and amended pleadings filed by the parties and five days of trial. In order to understand the factual and procedural posture of this appeal, it is necessary to review the relevant prior litigation over custody and related matters and the resulting judgments.

### A. Previous Litigation and Judgments Between the Parties

Shortly after the divorce proceedings commenced and after a hearing, the trial court issued an interim judgment on November 26, 2013, setting Mr. Underwood's monthly child support obligation at $400.00; awarding the parties

---

[1] Throughout the record, "Leigh A. Underwood" is also referred to as "Leigh Ann Underwood." She is also referred to by the last name of "Saia" (the last name of her first husband) and "Texada" (the last name of her current husband). For consistency and clarity herein, we will refer to her as Mrs. Texada.

2

joint custody of the child; designating Mrs. Texada as the domiciliary parent; awarding Mr. Underwood physical custody of the child every other weekend from Friday at 6 p.m. until Sunday at 6 p.m., every other Wednesday from 5 p.m. until Friday morning when the child was brought to child care, and every Tuesday evening from 5 p.m. until 8 p.m.; and ordering the parties to enroll in and utilize Our Family Wizard as their primary source for communication.[2]

Thereafter, a two-day trial on the issue of custody was held, resulting in a judgment that was signed by the trial court on August 8, 2014 (sometimes referred to as "the first considered decree"). This judgment granted the parties joint custody of the child, named Mrs. Texada as the domiciliary parent, and awarded the parties equal physical custody of the child on an alternating 2-day, 2-day, 3-day basis, with each party's 3-day period falling on the weekend. The trial court granted the parties the "right of first refusal" of three hours, in that if either party was not able to be with the child for a period in excess of three hours during their scheduled custodial time, even if the absence was due to work, then he/she was to offer to the other parent the right to keep the child during that period of time. The trial court specifically allowed Mr. Underwood's father to pick the child up at the start of Mr. Underwood's custodial time. The trial court also ordered the parties to communicate with each other on a reasonable and regular basis, to engage in at least four sessions with a parenting coordinator, and to continue to use Our Family Wizard to communicate with each other regarding the child. In this judgment, the trial court also ordered Mr. Underwood to pay child support in the amount of $128.19 per month, ordered Mrs. Texada to maintain the child on a policy of health insurance, and ordered that the child's extraordinary medical expenses be allocated 53.69% to Mrs. Texada and 46.31% to Mr. Underwood.

---

[2] Our Family Wizard is a website that facilitates communications between parents that are separated or divorced. See www.ourfamilywizard.com.

3

Shortly thereafter, Mrs. Texada sought a modification of the first considered decree, *i.e.* a reduction in Mr. Underwood's periods of physical custody and a recalculation of the child support obligation. Mr. Underwood responded with a request for Mrs. Texada to be held in contempt of court due to several alleged violations of the first considered decree, such as her refusal to allow Mr. Underwood's father to pick up the child at the start of Mr. Underwood's custodial time. After a three-day trial, the trial court signed a judgment on November 10, 2015 (sometimes referred to as "the second considered decree"). Therein, the trial court specifically denied Mrs. Texada's request for a modification of custody/decrease in Mr. Underwood's physical custodial time and maintained the award of joint custody to the parties, the designation of Mrs. Texada as the domiciliary parent, and the 2-day, 2-day, 3-day equal physical custody schedule. The trial court changed the 3-hour right of first refusal set forth in the first considered decree to a 4-hour right of first refusal and further "require[d] the parties to exercise flexibility in the custodial schedule so that the minor child [was] not deprived of time with either parent." The trial court ordered the parties to continue to use Our Family Wizard to communicate with each other and to turn on all functions of that system and appointed Leslie Todd as the parenting coordinator for the parties.

In addition, retroactive to October 2, 2014, the trial court ordered Mrs. Texada to pay child support to Mr. Underwood in the amount of $136.42 and terminated Mr. Underwood's obligation to pay child support to Mrs. Texada. The trial court further ordered that Mrs. Texada was to maintain health insurance on the child and that Mrs. Texada would be responsible for 61.48% and Mr. Underwood responsible for 38.52% of the child's extraordinary medical and other expenses. The trial court found Mrs. Texada in contempt of court for failing to allow Mr. Underwood's father to pick up the child as provided in the previous judgment and

4

ordered her to pay attorney fees.

The trial court specifically ordered that there be no negative communication between the parties and that the parent who did not have physical custody be allowed to talk to the child by telephone, with the party having physical custody of the child being required to answer the telephone and to tell the child that the other parent was on the telephone.

Mrs. Texada subsequently filed a rule for contempt, alleging that Mr. Underwood violated various provisions of the second considered decree. Mr. Underwood responded with rules for contempt, alleging that Mrs. Texada was in arrears in her child support obligation and that she had also violated various provisions of the second considered decree. Mrs. Texada sought a reduction in child support and amended her rule for contempt to include allegations that Mr. Underwood failed to pay his percentage share of the child's extraordinary and other expenses. Mr. Underwood then amended his rule for contempt to allege additional violations of the second considered decree by Mrs. Texada, including her failure to utilize the services of Leslie Todd, the parties' parenting coordinator, her failure to maintain the child on a policy of health insurance, and her abuse of her title as domiciliary parent.

Based on these outstanding issues, the parties entered into a stipulated judgment, which was signed by the trial court on May 19, 2017 ("the stipulated judgment"). The stipulated judgment continued the parties' previous joint custodial arrangement, the designation of Mrs. Texada as the domiciliary parent, and allocation of equal periods of physical custody. However, by agreement of the parties, the physical custodial schedule was changed from an alternating 2-day, 2-day, 3-day schedule to alternating on a weekly basis, i.e. Friday at 8:30 a.m. until the following Friday at 8:30 a.m. The parties agreed that for the 2017-2018 school year, the child would attend Jefferson United Methodist Preschool; thereafter, for

5

the 2018-2019 school year, when the child entered kindergarten, the child would attend The Dunham School.

The parties also agreed that the 4-hour right of first refusal would continue until the child started kindergarten; thereafter, the right of first refusal would be changed to overnight. The parties further agreed that neither party would pay child support to the other; that each party would pay 50% of the child's school tuition (registration, tuition, fees, and other school-related expenses), unpaid extraordinary medical/dental expenses not covered by insurance, and extracurricular activities; and that Mrs. Texada would maintain the child on a policy of health insurance. The parties agreed to dismiss all pending motions before the trial court, and that neither party owed the other any outstanding child support and/or reimbursement of expenses related to the child as of May 5, 2017. Lastly, the stipulated judgment provided that any previous orders not in conflict with the terms of the stipulated judgment would remain in full force and effect.

### B. Present Litigation Between the Parties

Approximately nine months after the stipulated judgment, on February 27, 2018, Mrs. Texada sought to modify custody again by decreasing Mr. Underwood's physical custodial time from alternating weeks to every other weekend, as well as another rule for contempt. Therein, Mrs. Texada alleged that a modification of the custodial arrangement was warranted because she had remarried, had stable part-time employment and a stable home, allowing her to more fully provide for the temporal, emotional, spiritual, and physical needs of the child, including but not limited to food, shelter, education, clothing, medical care, education, and other material needs.

Mrs. Texada also claimed that numerous issues had arisen between her and Mr. Underwood that justified a modification of custody. More specifically, Mrs. Texada claimed that Mr. Underwood did not have a stable home. She alleged that

6

Mr. Underwood either spent the night at his father's home or with his girlfriend and that the child did not have his own room. She also claimed that Mr. Underwood refused to inform her of the travel itinerary when vacationing with the child, failed to abide by pick-up and drop-off arrangements for the child, and failed to provide consistent medical care as directed by the child's pediatrician. She further alleged that Mr. Underwood was combative and confrontational on every issue involving the child; that Mr. Underwood initially agreed with Leslie Todd, the parenting coordinator, to see Carolyn Ellender, LCSW, with Mrs. Texada and the child in order to seek help for the child, but had since changed his mind; and that Mr. Underwood did not allow Mrs. Texada to talk to the child when the child was in his care.

In regards to contempt, Mrs. Texada alleged that Mr. Underwood had violated various terms of the previous judgments and was in contempt of court by refusing to allow Mrs. Texada to speak with the child on the telephone; failing to return the child to her during her custodial periods; failing to give the child his prescription medication during his custodial period; failing to notify Mrs. Texada of serious injuries to the child during vacation; failing to follow doctor's orders in connection with the treatment of the child; not exercising flexibility with the custodial schedules; continuing to change custodial periods and pick-up and drop-off times with little to no notice; failing to communicate about the education and development of the child, and otherwise changing his mind after agreeing to certain activities; and failing to contact and/or follow the agreements made with the parenting coordinator, Leslie Todd.

Mr. Underwood responded with an answer and reconventional demand. In Mr. Underwood's answer, Mr. Underwood essentially denied the allegations of Mrs. Texada's motion to modify custody, specifically asserting that the child did have his own room at Mr. Underwood's home and that he was willing to continue

7

to see Leslie Todd as the parenting coordinator, but it was Mrs. Texada, who in a March 8, 2018 email, informed Leslie Todd that she (Mrs. Texada) was no longer willing to meet with her and would be addressing the issues between her and Mr. Underwood in court.

With respect to the reconventional demand, Mr. Underwood sought a modification of the previous considered decrees of custody and asserted that Mrs. Texada should be held in contempt for violating the terms of the previous judgments. Mr. Underwood claimed that Mrs. Texada was in contempt of court for refusing to attend appointments with Leslie Todd; unilaterally and arbitrarily changing the times for the child to have contact with his father, resulting in Mr. Underwood being unable to talk to his son when he did not having physical custody; exercising her summer vacation time between her custodial weeks, thereby keeping the child away from him for an extended period of time; failing to maintain the child on health insurance and forcing Mr. Underwood to pay one-half of the full fees incurred for doctor's visits and medications without the benefit of insurance; refusing to follow the orders of the child's pediatrician regarding the care of the child; deliberately misleading the court regarding the child's health diagnoses and medications; and refusing to open messages in Our Family Wizard. Mr. Underwood also requested that Mrs. Texada bear the cost of the out-of-pocket medical expenses incurred for the child as a result of her failure to maintain insurance on the child.

Concerning the modification of custody, Mr. Underwood alleged that the child was over-scheduled, as Mrs. Texada insisted that the child participate in too many extracurricular activities, some of which did not interest the child, and that the terms of the previous judgment should be modified to allow each parent to choose one extracurricular activity for the child each season. Mr. Underwood asserted that it was not in the best interest of the child to decrease Mr.

Underwood's physical custodial time, as the parties had been sharing equal physical custody for most of the child's life and the child was accustomed to spending equal amounts of time with each parent. Mr. Underwood further asserted that Mrs. Texada refused to make any attempt to co-parent the child and that she was hostile, aggressive, and changed the rules for both the exchange of physical custody and the telephone calls with the child for no reason. Mr. Underwood requested that if the court determined that it was in the best interest of the child to live primarily with one parent and that the other be given weekend visitation, it was in the best interest of the child that he be given primary custody and named domiciliary parent.

Mrs. Texada then filed an answer to Mr. Underwood's reconventional demand generally denying the allegations therein, a supplemental rule for contempt, and a motion for child support. As to child support, Mrs. Texada alleged that the incomes of the parties had changed since the last judgment and that the child support obligation and each party's percentage share of extraordinary medical and other expenses needed to be re-calculated. In the supplemental rule for contempt, Mrs. Texada alleged that Mr. Underwood had willfully violated the terms of the previous judgments by failing to communicate the travel itinerary, including where the child would be staying during Mr. Underwood's vacation schedule; failing to allow Mrs. Texada to care for the child during the summer when he was working and the child was in his physical custody; refusing to allow the child to attend a family picnic at school that Mrs. Texada and her family intended to attend; failing to communicate with Mrs. Texada about the child's homework from speech therapy; continuing to harass and excessively call Mrs. Texada multiple times a day while she was on vacation with the child, even though she offered a schedule of calling; refusing to allow the child to speak to Mrs. Texada during his custodial period; and failing to pay or reimburse Mrs. Texada

for extracurricular activities and prescriptions.

Mr. Underwood filed a supplemental and amending reconventional demand, alleging additional violations of the previous judgment by Mrs. Texada, including that when she took the child out of state for vacation over the summer, she told Mr. Underwood that they would be staying in Arkansas; however, they also went to Branson, Missouri without notifying Mr. Underwood. He also alleged that Mrs. Texada failed to give the requisite 60-day notice for vacations, but she took the child on vacation nonetheless and that she continues to take vacations at times that interfere with his custodial schedule. Mr. Underwood then filed an answer to Mrs. Texada's supplemental motion and a second supplemental and amending reconventional demand, admitting that the income of the parties had changed, but that he was not earning a higher salary and that Mrs. Texada was voluntarily unemployed or underemployed. In addition, Mr. Underwood alleged that Mrs. Texada has allowed the child to miss school to go on vacation, that she failed to bring the child to many of his extracurricular sporting events during her custodial time, and that due to Mrs. Texada's refusal to provide financial documentation and tax disclosures, he has been unable to obtain financial aid for the child to attend The Dunham School.

After a five-day trial on the pending issues, the trial court signed a judgment on September 9, 2020 (sometimes referred to as "the third considered decree"). This judgment provided that the parties would continue to exercise joint custody of the child, with each party having physical custody of the child on a week to week basis, from 8:30 a.m. on Friday until the following Friday. However, the judgment modified the previous domiciliary parent designation to provide that Mr. Underwood would have the domiciliary parent decision-making authority as it related to educational decisions, extracurricular activity decisions (including sporting and summer activities), and exchange logistics and that Mrs. Texada

would have the domiciliary parent decision-making authority as it related to medical decisions and general welfare decisions. The judgment further provided that the parties should continue to communicate regarding all of these issues, but if a joint decision could not be made, then barring an emergency, the parent with domiciliary parent decision-making authority would be entitled to make the decision. As to major medical decisions, the judgment provided that such decisions should be made jointly, with both parents having the opportunity to discuss and share information on the issue; if the parties were unable to reach an agreement, prior to filing any pleading seeking a judicial determination of the issue, they should mediate with a legal professional and/or a parenting coordinator to receive guidance and assistance to arrive at an agreement. The trial court also appointed Carlo Cuneo as parenting coordinator.

The judgment provided that the parties would continue to use Our Family Wizard as their primary source of communication, barring emergencies, as well as the other functions available therein, including the calendar function, banking function, tone monitor function, and expense function. The judgment also provided that all exchanges of the child would be at The Dunham School, except on non-school days, vacation days, and summer exchanges, wherein the exchange would be at the Kleinpeter Sheriff Substation at 5:00 p.m. The judgment further provided that the parent without physical custody of the child would initiate a telephone call to the other party to speak to the child at 8:00 p.m. on Sunday, Tuesday, and Thursday; that if the parent without physical custody does not initiate the communication, then the parent with physical custody does not have the responsibility to initiate the communication; and that if the child was participating in an extracurricular activity, then the parent with physical custody would notify the other parent immediately.

The trial court found Mr. Underwood in contempt of court for failing to

11

utilize Our Family Wizard as ordered by the court in the November 26, 2013 judgment (the first considered decree) and for failing to co-parent with Mrs. Texada and exercise flexibility in the custodial schedule as ordered in the November 10, 2015 judgment (the second considered decree). Mrs. Texada was found in contempt of court for failing to maintain the health insurance on the child as ordered by the November 10, 2015 judgment (the second considered decree), for failing to communicate fully through Our Family Wizard as ordered by the November 26, 2013 judgment (the first considered decree), and unilaterally changing the times for the telephone call between the child and Mr. Underwood. Mrs. Texada was ordered to pay all medical bills incurred during the period where the child was not covered by health insurance. The trial court declined to award either party attorney fees or costs for their respective contempt motions, as both parties were found in contempt.

As to child support, the trial court ordered Mr. Underwood to pay Mrs. Texada the sum of $134.09 per month, retroactive to December 7, 2018. This child support calculation was based on the trial court's finding that Mrs. Texada's income tax return with her new husband return showed gross income in the amount of $1,204,721.00 a year; that Mrs. Texada's income "earning potential was $70,000.00 per year, which is a monthly gross income of $5,333.33;" and that Mr. Underwood's monthly gross income was $7,627.86. This calculation did not take into consideration the costs of health care, tuition, or other expenses.

The trial court further ordered Mrs. Texada, through her husband, to continue to maintain health, vision, and dental insurance on the child, and that the parties split 50/50 the costs of all unpaid extraordinary medical, dental, orthodontic, and vision expenses of the child. As to the child's private school tuition, the trial court deviated from the child support worksheet and guidelines and ordered Mrs. Texada to pay 65% of the expense and Mr. Underwood to pay 35%

12

of the expense.

From this judgment, Mrs. Texada has appealed, contending that the trial court erred in: (1) designating Mr. Underwood as the domiciliary parent relative to educational decisions, extracurricular activities, and logistics for exchanging the child; (2) determining child support by (a) miscalculating the basic child support obligation,[3] (b) failing to consider the health insurance premium for the child, and (c) deviating from the child support guidelines in the allocation of the cost of the child's private school tuition and in the allocation of other extraordinary expenses;[4] and (3) finding Mrs. Texada in contempt of court for (a) failing to maintain the child on health insurance, (b) failing to fully communicate with Mr. Underwood through Our Family Wizard, and (c) unilaterally changing the times for a telephone call between the child and Mr. Underwood.

## II. LAW AND DISCUSSION

### A. Modification of Custody/Authority of the Domiciliary Parent

Mrs. Texada first contends on appeal that the trial court erred in modifying the parties' prior considered decree of joint custody by designating Mr.

---

[3] In Mrs. Texada's assignment of error with respect to the calculation of child support, she also contends that the trial court erred in determining the date to which the child support award was made retroactive. At trial, Mrs. Texada argued that the award should be made retroactive to the date she requested a modification of custody, i.e. February 27, 2018, or alternatively, the date that Mr. Underwood filed his request for a modification of custody, i.e., June 13, 2018, essentially arguing that those pleadings would have implicitly placed child support at issue. The trial court found no merit to this argument and made the child support award retroactive to December 7, 2018, which was the date that Mrs. Texada filed her motion seeking child support, i.e. when she actually made judicial demand for child support. Although the issue of the retroactivity of the child support award was not briefed by Mrs. Texada and we are authorized to deem such assignment of error abandoned pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4), we point out that based on this Court's recent decision in **Franks v. Franks**, 2020-1170 (La. App. 1st Cir. 4/16/21), ___ So.3d ___, 2021 WL 1439541, any such arguments by Mrs. Texada relative to the retroactivity issue lack merit. Therefore, we decline to fully address the issue herein.

[4] Although the issue of whether the trial court erred in deviating from the child support guidelines with respect to allocating the other extraordinary expenses was not listed in either the assignments of error or the issues presented for review as required by Uniform Rules—Courts of Appeal, Rule 2-12.4(A)(5) and (6), Mrs. Texada argued this issue in her brief when she argued the issue relative to the allocation of the child's private school tuition. Since the discussion and analysis regarding the deviation from the child support guidelines with respect to the allocation of both private school tuition and other expenses is similar, in the interest of justice, we will address the issue. See Uniform Rules—Courts of Appeal, Rule 1-3; La. C.C.P. 2129 and 2164.

13

Underwood as the domiciliary parent over education decisions, extracurricular activities, and exchange logistics—authority that was hers alone, as the domiciliary parent, under the prior considered decree. Mrs. Texada contends that the burden of proof set forth in **Bergeron v. Bergeron**, 492 So.2d 1193, 1200 (La. 1986), was not met and that the trial court's judgment in this regard should be reversed. We find no merit to her arguments.

Every child custody case must be viewed in light of its own particular set of facts and circumstances. **Major v. Major**, 2002-2131 (La. App. 1st Cir. 2/14/03), 849 So.2d 547, 550; **Gill v. Dufrene**, 97-0777 (La. App. 1st Cir. 12/29/97), 706 So.2d 518, 521. The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; **Evans v. Lungrin**, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731, 738. This applies not only in actions setting custody initially, but also in actions to change custody. **Mulkey v. Mulkey**, 2012-2709 (La. 5/7/13), 118 So.3d 357, 364. It is the child's emotional, physical, material, and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict. **C.M.J. v. L.M.C.**, 2014-1119 (La. 10/15/14), 156 So.3d 16, 28.

Louisiana Civil Code article 134[5] provides a non-exclusive list of factors that the trial court shall consider, along with all other relevant factors for the

---

[5] Louisiana Civil Code article 134(A) provides, that the court shall consider "all relevant factors in determining the best interest of the child," which include:

> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
>
> (2) The love, affection, and other emotional ties between each party and the child.
>
> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
>
> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

determination of the best interest of the child, and the determination as to the weight given each factor is left to the discretion of the trial court. **Hodges v. Hodges**, 2015-0585 (La. 11/23/15), 181 So.3d 700, 703. "The illustrative nature of the listing of factors contained in [La. C.C. art.] 134 gives the court freedom to consider additional factors; and, in general, the court should consider the totality of the facts and circumstances of the individual case." **Hodges**, 181 So.3d at 703. The consideration of all relevant factors under La. C.C. art. 134 should be followed in actions to change custody, as well as in those to fix custody initially. La. C.C. art. 134, 1993 Revision Comment (d). However, the trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. **Breaux v. Breaux**, 96-214 (La. App. 3rd Cir. 7/17/96), 677 So.2d 1106, 1108.

---

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

15

In addition to consideration of the best interest of the child, in actions to change custody decisions rendered in considered decrees,[6] an additional jurisprudential requirement is imposed. **Evans**, 708 So.2d at 738. When a trial court has made a considered decree of permanent custody, the party seeking a change bears the heavy burden of proving that a change of circumstances has occurred, such that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree, **or** of proving by clear and convincing evidence that the harm likely caused by a change of environment is substantially outweighed by its advantages to the child. **Bergeron**, 492 So.2d at 1200; see also **Mulkey v. Mulkey**, 2012-2709 (La. 5/7/13), 118 So.3d 357, 364-365.[7]

In this case, the trial court maintained its prior award of joint custody in favor of the parties and its prior award of equal physical custody. However, the trial court modified its prior designation of Mrs. Texada as the domiciliary parent by specifically allocating the legal authority and responsibility of the parents. Physical custody is a separate matter from legal authority and responsibility over a

---

[6] A considered decree is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children. **Evans**, 708 So.2d at 738.

[7] However, in cases where the original custody decree is a stipulated judgment, such as when the parties consent to a custodial arrangement and no evidence of parental fitness is taken, the heavy burden of proof enunciated in **Bergeron** is inapplicable. **Evans**, 708 So.2d at 738. Instead, where the original custody decree is a stipulated judgment, the party seeking modification must prove (1) that there has been a material change of circumstances affecting the welfare of the child since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. **Evans**, 708 So.2d at 738.

In this case, the parties agree that the **Bergeron** standard or burden of proof was applicable to any modification of custody, as the underlying custody decree establishing joint custody, with the parties sharing equal physical custody and Mrs. Texada designated as the domiciliary parent, was a considered decree, *i.e.*, the November 10, 2015 judgment (as well as the August 8, 2014 judgment). Although the parties entered into a stipulated judgment on May 19, 2017, which modified the parties' underlying custody decree, that judgment only modified the manner in which the parties were sharing equal physical custody, *i.e.*, the equal physical custodial schedule, from an alternating 2-day, 2-day, 3-day basis to an alternating weekly basis. As such, the **Bergeron** burden of proof remained applicable to any request seeking a modification of the award of joint custody, the designation of the domiciliary parent, and the award of equal physical custody. See **D'Aquilla v. D'Aquilla**, 2003-2212 (La. App. 1st Cir. 4/2/04), 879 So.2d 145, 148-149, writ denied, 2004-1083 (La. 6/25/04), 876 So.2d 838; **Paille v. Newell**, 2019-1694 pp. 6-8 (La. App. 1st Cir. 7/8/20), 2020 WL 3840756, at *4 )(*unpublished*).

child. **Hodges**, 181 So.3d at 705. The term "custody" is usually broken down into two components: physical or actual custody and legal custody. **Hodges**, 181 So.3d at 705. Once a trial court awards legal joint custody, La. R.S. 9:335 governs the details of that custodial arrangement, including physical custody, as well as the legal authority and responsibility of the parents. See **Hodges**, 181 So.3d at 703.

Louisiana Revised Statutes 9:335 provides, in pertinent part:

A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.

(2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.

(b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.

\* \* \*

(3) The implementation order shall allocate the legal authority and responsibility of the parents.

B. (1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.

(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.

(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.

In addition, La. R.S. 9:336 provides that "[j]oint custody obligates the parents to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority."

17

Thus, in a case involving joint custody, La. R.S. 9:335(B)(1) provides for the designation of a domiciliary parent, except when there is an implementation order to the contrary or for other good cause shown; the domiciliary parent is defined as "the parent with whom the child shall primarily reside," and "shall have authority to make all decisions affecting the child, unless an implementation order provides otherwise." La. R.S. 9:335(B)(2) and (3). However, in exercising this decision-making authority, the parents must confer with each other. La. R.S. 9:336.

The November 10, 2015 judgment designated Mrs. Texada as the domiciliary parent, and thus, while it granted her exclusive authority to make all decisions affecting the child, it also obligated her to confer with Mr. Underwood. Therefore, in order to modify the November 10, 2015 judgment by allocating Mr. Underwood the decision-making authority over educational decisions, extracurricular activities, and exchange logistics, the trial court had to find: (1) that a material change in circumstances affecting the welfare of the child had occurred since the rendition of the November 10, 2015 judgment, and (2) that the burden of proof set forth in **Bergeron** had been met—that the continuation of Mrs. Texada as the domiciliary parent with exclusive decision-making authority was so deleterious to the child so as to justify a modification (or division) of that decision-making authority **or** that the harm likely to be caused by a change or division of the decision-making authority was substantially outweighed by its advantages to the child. See **Mulkey**, 118 So.3d at 365.

The trial court, in reaching its decision that a modification of the decision-making authority was warranted, noted that there were two previous considered decrees and that the issues in this case concerned a "fundamental problem of communication between the parties." The trial court noted that the measures and resources included in the past judgments, such as the appointment of a parenting coordinator, which were aimed at helping the parties' communication issues, had

18

failed and that the parties still had insufficient joint decision-making abilities. The trial court found that the communication issue between the parties and their inability to co-parent was attributable to both parties in that Mr. Underwood needed to "respond directly to [Mrs. Texada's] messages" and that Mrs. Texada needed to "facilitate actual discussion of issues and not dictate decisions." The trial court then set forth specific examples from the evidence of the parties' mutual inability to communicate and co-parent. These instances included Mr. Underwood not allowing the child to call maternal relatives during his physical custodial time, Mr. Underwood's failure to inform Mrs. Texada about a serious medical condition (a severe sunburn and jellyfish sting) that occurred while the child was vacationing at the beach with Mr. Underwood, Mrs. Texada's refusal to allow the child to play on a youth sports team that was coached by Mr. Underwood, Mr. Underwood's refusal to allow the child to attend his step-sister's college graduation, Mrs. Texada's dilatory tactics in producing the child's passport to Mr. Underwood, which he needed for a vacation that was planned for the child, and Mrs. Texada's evasiveness with regard to her vacation plans with the child. The trial court also pointed to two particular instances involving the safety of the child while in Mrs. Texada's physical care (allowing the child on a boat in a lake without wearing a life vest and her failure to ensure that the child was wearing protective gear while riding a dirt bike, which resulted in an injury to the child's knee following an accident) wherein Mrs. Texada justified her actions, and noted that those instances would have been "a major problem" if either instance had occurred when Mr. Underwood had physical custody of the child.

With respect to Mrs. Texada's refusal to allow the child to participate on a youth sports team in which Mr. Underwood was the coach (when the child had previously played on that team), the trial court found Mrs. Texada's decision in this regard to be very sad when considering the best interests of the child and

"extremely problematic," particularly when it was "clear that [the] child [was] very proud of the fact that[,] of all the kids on the team, his dad [was] the coach of the team" and that Mr. Underwood had offered to bring the child to games and practices.

The trial court stated that in reaching its decision, it considered the testimony of Leslie Todd, the court-appointed parenting coordinator, as well as the testimony of all the witnesses, including the parties, and that it found Mr. Underwood's testimony more credible than the testimony of Mrs. Texada. The trial court then ruled that it was maintaining its previous award of joint custody, maintaining the equal physical custodial schedule, and its order that the parties utilize Our Family Wizard, and that its goal in rendering the remaining specific portions of the judgment was to minimize the contact and interaction between the parties. The trial court then ruled that as it related to the domiciliary parent designation, it was "splitting the domiciliary parent responsibilities," but that the "domiciliary parent designation on particular issues still require[d] communication ... on those issues." The trial court then stated that it was designating Mrs. Texada as the domiciliary parent over medical decisions and general welfare decisions and that it was designating Mr. Underwood as the domiciliary parent over educational decisions, extracurricular activities and exchange logistics. The trial court then stated that it "intentionally made that designation because [it] [found] that the decisions that [Mr. Underwood] made on the sports issues and the educational ...decisions that [he] made in light of [Mrs.] Texada being the domiciliary parent were more in the child's best interest." Further, the trial court found that his decisions "were more focused on the best interest of the child" rather than based on his relationship with Mrs. Texada.

Since the trial court is in the best position to ascertain the best interest of the child given each unique set of circumstances, a trial court's determination of

custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. **Major**, 849 So.2d at 550. Furthermore, in most child custody cases, the trial court's determinations are based heavily on factual findings. It is well-settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*

Based on our review of the record, we find no manifest error or abuse of discretion in the trial court's determination that the burden of proof set forth in **Bergeron** had been met or in its decision to modify the prior considered decrees by allocating Mr. Underwood parental decision-making authority over educational decisions, extracurricular activities, and exchange logistics. We find that the evidence offered at trial not only established a change of circumstances materially affecting the welfare of the child, but also that the continuation of the present allocation of parental authority exclusively to Mrs. Texada, as the domiciliary parent, was deleterious to the child. Further, from the evidence presented, we cannot say that any harm will come to the child by changing the parental decision-making authority from Mrs. Texada, as the domiciliary parent, to Mr. Underwood having parental decision-making authority over educational decisions, extracurricular activities, and exchange logistics; rather, the record reveals that the manner in which the trial court allocated decision-making authority will only benefit the child by minimizing the necessary communications and interactions between the parties. Lastly, the evidence shows that the trial court's allocation of parental decision-making authority in the manner that it did was in the best interest of the child.

As the trial court noted, the record in this matter shows that the parties herein have a well-established history of communication and co-parenting problems, and that these problems can be attributable to both Mrs. Texada and Mr. Underwood. However, since the November 10, 2015 judgment, the child reached school age, started attending school and participating in school-related activities, and began participating in youth sporting activities, which has intensified the communication issues and created more animosity between the parties. More particularly, as noted above, the trial court in its reasons for judgment, stated that Mrs. Texada, as the domiciliary parent, had not "facilitate[d] actual discussion of issues," but rather had "dictate[d] decisions" and that despite Mrs. Texada's behavior, with respect to educational decisions, extracurricular activities, and exchange logistics, Mr. Underwood still managed to make decisions that were in the best interest of the child. We agree with the trial court that as to those issues, the record contains evidence regarding several incidents where Mrs. Texada's decisions and behavior appear to be more about exerting or demonstrating her authority as domiciliary parent rather than the child's best interest or facilitating a discussion concerning what was in the child's best interest—behavior that we find, and the trial court obviously found, was deleterious to the child.

As set forth above, in an effort to aid the parties with their communication and co-parenting issues, the trial court, in its November 10, 2015 judgment, appointed Leslie Todd as their parenting coordinator. Mrs. Todd testified at the trial of this matter. According to her testimony, the parties had several joint and individual meetings with her. Following efforts to coordinate another joint meeting between the parties, Mrs. Texada ultimately informed Mrs. Todd that she did not want another meeting as they would be "dealing with [their] issues in court.

Mrs. Todd testified that one of the many issues that arose between the parties concerned the logistics for exchanging the child. Mrs. Todd explained that

22

Mrs. Texada insisted on picking the child up from school and bringing the child to her home, and then requiring Mr. Underwood to pick the child up from Mrs. Texada's home. Mr. Underwood had an issue with this arrangement because he lived fairly close to the school, had to drive to Mrs. Texada's home, and then back to his neighborhood, when it would have been easier for him to just pick the child up at school. Mr. Underwood testified that Mrs. Texada often made exchanges of the child difficult, often imposed unnecessary travel throughout the city, and had previously refused to allow Mr. Underwood's father to pick up the child during Mr. Underwood's custodial time. Although the trial court allocated Mr. Underwood the decision-making authority with respect to exchange logistics, the trial court, in its judgment, specifically set both the location and times of all exchanges, *i.e.* on school days, the exchange was to occur at the child's school at the end of the school day and on non-school days, vacation days, and summer exchanges, the exchange was to occur at a sheriff's substation at 5:00 p.m. Given the specific parameters already set by the trial court for exchange logistics, the trial court has minimized the interaction between the parties. To the extent that the trial court's judgment does not address all of the exchange logistics or to the extent that a modification of those exchange logistics may be necessary, the trial court's allocation of decision-making authority in that regard to Mr. Underwood, who demonstrated logical reasons for exchange logistics rather than rigid inflexibility, was reasonable and certainly not detrimental to the child.

In addition, the testimony of both the parties and Mrs. Todd established that the parties had several disagreements over the youth sports programs in which the child was involved. The record reveals that Mr. Underwood was a football coach for eleven years, and he had coached both high school football and college football (at Louisiana State University). For approximately three seasons, the child participated in the Istrouma youth football league where Mr. Underwood was the

child's head coach. Mr. Underwood testified that during the child's first season with the Istrouma league, Mrs. Texada brought the child to all of his practices and games during her custodial time. In the second year, Mrs. Texada did not bring the child for one of his practices and one of his games during her custodial period. In the third year, Mrs. Texada did not bring the child to any of his practices or games during her custodial time; she also did not bring the child for the scheduled team picture during her custodial time. The trial court found the child's absence from the team picture "one of the saddest pieces of evidence … in this case."

Mr. Underwood testified regarding an incident that occurred after a football game during Mrs. Texada's custodial time. Following the game, the team was set to have an awards ceremony; however, Mrs. Texada would not allow the child to stay for the awards ceremony. When Mr. Underwood questioned why, Mrs. Texada responded "We're leaving out of here. I'm domiciliary parent[,] and it's time to go." This incident was very upsetting to the child.

At the start of what would have been the child's next season with Istrouma, Mr. Underwood registered the child for his Istrouma football team. However, Mrs. Texada refused to let the child participate because she did not want the child to play in the Istrouma league. Instead, she decided that she wanted the child to play in the Traction league. Mr. Underwood did not understand why Mrs. Texada did not want the child to play in the Istrouma league because Mr. Underwood coached in that league, and in his experience as a high school and college football coach, he believed that the Istrouma league was a good program. Istrouma was also the youth league that was part of Mrs. Texada's church. Mrs. Texada testified that she wanted the child to move from the Istrouma league to the Traction league because she believed that the child, who was six years old at the time, "out[-]grew" the Istrouma program because his skill level was above that of his peers in the league. However, we note that Mrs. Texada provided no explanation as to how she

24

determined that the child's skills had exceeded that of his peers, particularly when Mr. Underwood's testimony established that in the preceding season, Mrs. Texada failed to bring the child to any of the games or practices during her custodial time. Rather, as evidenced by subsequent communications between the parties, as detailed below, it appears that her decision in this regard was based on asserting her authoritative role as domiciliary parent over Mr. Underwood.

After Mrs. Texada moved the child to the Traction football league, Mr. Underwood contacted the child's coach and became an assistant coach on the child's team. Mr. Underwood testified regarding an incident that occurred following a practice while the child was playing in that league. Apparently, the child showed up to football practice wearing a baseball hat. Because the kids were performing drills, Mr. Underwood asked the child to remove his hat because it kept sliding down, and the child did not need to wear a hat while performing football drills. Following practice, Mrs. Texada sent Mr. Underwood an email via Our Family Wizard, as follows:

> I sent [the child] to football practice wearing a hat. He said that you took it off and told him he can't wear hats at football. If I send [the child] with a hat in the future[,] do not remove the hat from him. Also[,] he said you have the hat. Please return it. During my time[,] he is to wear what I tell him and what I send him with. Please respect my parenting and my time. (R1098; Dad 24)

Mr. Underwood responded:

> He can get the hat when I see him at the next practice. But as far as the hat is concerned, I am his coach, and if I think that it is best for him not to wear the hat [during practice], then it's best not to wear the hat. He is welcome to wear the hat to practice & leaving practice. But not during practice. (R1099; Dad 24)

Mrs. Texada responded:

> Absolutely not. You are not his coach and even if you are an assistant coach[,] you do not get to say what he does and doesn't do. I'm his parent. You being "a coach" does not outweigh me being his mother. Sorry. But that's not how it works. If I have to continue this problem with you, **I will pull him out of this league, as well.** This is why it is no longer a viable option for you to be his coach.

(Emphasis added).

Again, although the trial court allocated Mr. Underwood the decision-making authority over extracurricular activities for the child, the trial court also set forth in its judgment what sports and/or extracurricular activities the child would participate in. In addition, the trial court also granted Mrs. Texada the opportunity to enroll the child in another sport. Given the specific parameters already set by the trial court for extracurricular activities, the trial court has addressed a main area of contention between the parties and again, has minimized the interaction between the parties. Further, the trial court's allocation of decision-making authority in that regard to Mr. Underwood was in the best interest of the child, as he demonstrated several attempts to discuss the child's participation in extracurricular activities, whereas Mrs. Texada not only failed to facilitate discussion on those issues, but imposed rules in the name of being the domiciliary parent.

Lastly, with regard to educational decisions, the record reflects that in the stipulated judgment, the parties initially agreed as to the choice of school for the child. Although Mrs. Texada points to testimony that Mr. Underwood, despite his agreement, failed to submit the application and pay his share of tuition, Mrs. Todd explained during her testimony that as soon as she made Mr. Underwood aware of the fact that he had not paid the tuition, he paid it by the end of that day.

As to responsibility for educational decisions, we note that evidence was also introduced establishing that during the Fall 2018/Spring 2019 school year, the child was tardy for school thirteen times—once while in Mr. Underwood's physical custody and the remainder while in the custody of Mrs. Texada. During that same school year, the child had twelve absences, all of which were during Mrs. Texada's physical custodial time. During the Fall 2019 school term, the child was absent five times, none of which were during Mr. Underwood's physical custodial time, and the child was tardy ten times, one of which was during Mr.

26

Underwood's physical custodial time. When Mr. Underwood questioned Mrs. Texada about the tardies and absences, the only explanation he was given was that they were due to vacations, that she (Mrs. Texada) was the domiciliary parent, and as such, she could take him out of school if she wanted. Notably, these absences due to vacations must have been troublesome to the trial court, as the trial court specifically ordered in its judgment that the child could miss no more than two days of school in a school year for vacation, unless both parties agreed. Furthermore, in light of this evidence and Mr. Underwood's concern over the significant number of absences and tardies while in the physical custody of Mrs. Texada, and Mrs. Texada's unwillingness to discuss the matter, the trial court's allocation of decision-making authority to Mr. Underwood for educational decisions was reasonable, supported by the record, and not detrimental to the child's best interest.

Accordingly, for all of the above reasons, we find no manifest error or abuse of discretion in the trial court's determination that a modification of the second considered decree from Mrs. Texada being the domiciliary parent to granting Mr. Underwood the decision-making authority with respect to educational decisions, extracurricular activities, and exchange logistics was warranted.

However, while we find no error or abuse of discretion in the trial court's decision to modify the parties' previous custodial decree by dividing the decision-making authority between the parties in the manner that it did, we find the trial court's use of the term "domiciliary parent" in its judgment before the allocation of both parent's decision-making authority to be both improper and unnecessary under the holding of the Louisiana Supreme Court in **Hodges**, 181 So.3d at 706-709.

In **Hodges**, 181 So.3d at 702, following the institution of divorce proceedings between the parents of a child, the trial court granted the parents joint

27

custody of their child, ordered that the parties share equal physical custody of the child on an alternating weekly basis, and designated both parents as "co-domiciliary parents." The mother challenged the trial court's decision, arguing that the designation of "co-domiciliary parents" was not authorized by La. R.S. 9:335; the mother also sought to be named as the sole domiciliary parent. **Hodges**, 181 So.3d 702. The supreme court granted the mother's writ application and reversed the judgment of the trial court. **Hodges**, 181 So.2d at 702 and 711.

In doing so, the supreme court analyzed La. R.S. 9:335[8] in detail and then held that "the plain language of La. R.S. 9:335 manifests the legislature's clear intent to establish a custodial system in which a child has a domiciliary parent and no more than one such parent," and that "[a]lthough each parent can share physical custody, the court can only designate a single domiciliary parent." **Hodges**, 181 So.3d at 706. However, the court also noted that "[a]lthough La. R.S. 9:335(B)(1) provides that '[i]n a decree of joint custody, the court *shall* designate a domiciliary parent,' the legislature provided two exceptions to this mandate—that is (1) 'when there is an *implementation order* to the contrary' or (2) 'for other good cause shown.'" **Hodges**, 181 So.3d at 708. "In other words, while La. R.S.9:335(B)(1) provides a preference for the designation of '*a* domiciliary parent,' a court could choose not to designate a domiciliary parent at all and, instead, to allocate authority by means of *an implementation order*." **Hodges**, 181 So.3d at 708-709. "With respect to what items must be included within a joint custody implementation order, La. R.S. 9:335 expressly states [that] [t]he implementation order shall allocate *the time periods during which each parent shall have physical custody of the child* so that the child is assured of frequent and continuing contact with both parents ... and shall allocate *the legal authority and responsibility of the parents*." **Hodges**, 181 So.3d at 710, <u>citing</u> La. R.S. 9:335 (A)(2)(a) and (3).

---

[8] The text of La. R.S. 9:335 is set forth hereinabove.

Thus, "according to La. R.S. 9:335(A)(1), (2)(a), and (3), when joint custody is decreed and in the absence of 'good cause shown,' a joint custody implementation order 'shall allocate the time periods during which each parent shall have *physical custody* of the child' *and* 'shall allocate the *legal authority and responsibility of the parents.*'" **Hodges**, 181 So.3d at 709. "It is therefore unnecessary and contrary to the plain language of La. R.S. 9:335 to designate both parents as 'co-domiciliary' parents in order to allocate parental responsibility." **Hodges**, 181 So.3d at 709.

As previously set forth, the trial court's judgment in this case provides that Mrs. Texada "shall be designated as the domiciliary parent as it relates to the medical decisions and general welfare decisions (not excluded by [Mr.] Underwood's domiciliary roles) regarding the minor child." It further provides that Mr. Underwood "shall be designated as the domiciliary parent as it relates to the educational decisions, extracurricular activities (which include sporting activities and summer activities) decision, and exchange logistics (not excluded by [Mrs.] Texada's domiciliary roles) regarding the minor child." Although the trial court's judgment does not utilize the term "co-domiciliary parents," it effectively designates two domiciliary parents, contrary to the holding of **Hodges**, 181 So.3d at 706, that "the court can only designate a single domiciliary parent."

In addition, as detailed hereinabove, the trial court's judgment provided that the parties would continue to share joint custody of the child; specified the exact time periods during which each parent has physical custody, *i.e.* equal custody on an alternating weekly basis from Friday at 8:30 a.m. until the following Friday; specified where the exchange of physical custody of the child was to occur; provided rules for the parents when communicating with the child by telephone; allocated specific parental decision-making authority to Mrs. Texada; provided specific parental decision-making authority to Mr. Underwood; provided rules for

communication between the parents; provided rules for the parents regarding their attendance at school and extracurricular activities; provided rules regarding the child's attendance at school; provided rules regarding major medical decisions; named a parenting coordinator for the parties; set forth specific extracurricular activities in which the child was to participate; set Mr. Underwood's basic child support obligation and set each parent's percentage share of the child's tuition expenses, extraordinary medical expenses, and extracurricular activity expenses; ordered Mrs. Texada to maintain health, vision, and dental insurance on the child; and set rules for the parents regarding guests of the opposite sex to whom the child was not related.

Thus, since the trial court's judgment provides for joint custody, specifically allocates the time periods during which each parent has physical custody of the child, and specifically allocates the legal authority and responsibility of the parties, the trial court's judgment meets all requirements for a joint custody implementation order. See La. R.S. 9:335(A)(1), (2)(a), and (3); **Hodges**, 181 So.3d at 709. It was, therefore, unnecessary and contrary to the plain language of La. R.S. 9:335 to designate each party as a domiciliary parent when allocating each parent's specific parental authority and responsibility. See **Hodges**, 181 So.3d at 709.

Accordingly, we amend the trial court's judgment to delete *all* references to "domiciliary parent"—both in regards to Mrs. Texada's decision-making authority regarding medical decisions and general welfare decisions and Mr. Underwood's decision-making authority regarding educational decisions, extracurricular activities, and exchange logistics. See La. C.C.P. art. 2164. C.f. **Coody v. Coody**,

30

2020-071 (La. App. 3rd Cir. 11/12/20), 307 So.3d 1093.[9] As amended, we affirm the trial court's judgment allocating Mr. Underwood decision-making authority regarding educational decisions, extracurricular activities, and exchange logistics.

## B. Child Support

Next, on appeal, Mrs. Texada maintains that the trial court erred in determining Mr. Underwood's total child support obligation because the trial court miscalculated the basic child support obligation, failed to include the cost of the health insurance premium for the child, and improperly deviated from the child support guidelines in allocating each party's percentage share of the cost of the child's private school tuition and extracurricular activity expenses.

### 1. Calculation of Basic Child Support Obligation

With respect to the calculation of the basic child support obligation, the judgment on appeal provided that Mr. Underwood would pay Mrs. Texada the sum of $134.09 per month, and that this calculation was based on the following factual findings: (1) that Mr. and Mrs. Texada's joint tax return provided that their gross income was $1,204,721.00; (2) that Mrs. Texada's income "earning potential [was] $70,000.00 which [was] a monthly gross income of $5,333.33 per month," and (3) Mr. Underwood's monthly gross income was $7,627.86. The judgment further provided that the amount Mr. Underwood had to pay Mrs. Texada did not include consideration of the costs of the child's health care, tuition, and other expenses.

---

[9] In **Coody**, 307 So.3d at 1097, following a trial on cross-motions for modification of custody, the trial court maintained its prior award of joint custody in favor of the parties and its prior designation of the mother as the domiciliary parent. However, the trial court allocated the father the authority and responsibility for making medical decisions and decisions regarding the children's extracurricular activities. The appellate court found the trial court's judgment was not a violation of **Hodges**, but rather an appropriate allocation of parental authority. **Coody**, 307 So.3d at 1101-1102.

We find **Coody** distinguishable from the case herein. In this case, the trial court designated both parents as domiciliary parents, whereas in **Coody**, the trial court designated only one domiciliary parent—the mother. Additionally, in this case, the trial court allocated specific decision-making authority to both of the parents, whereas in **Coody**, the trial court only allocated specific decision-making authority to the father, and thus, any remaining decision-making authority would go to the mother as the domiciliary parent.

31

Mrs. Texada does not challenge the trial court's underlying or implicit factual findings with respect to the income assigned to either party.[10] Rather, she contends that assuming her monthly income (or income earning potential) is $5,333.33 and that Mr. Underwood's monthly gross income is $7,627.86, the correct basic child support obligation using Worksheet B[11] is $191.01, not $139.04.

At the outset, we point out that both the judgment on appeal and the trial court's oral reasons contain a mathematical error. In the trial court's oral reasons for judgment and the judgment on appeal, the trial court found Mrs. Texada's income earning potential to be $70,000.00 per year and that this yielded a gross monthly income of $5,333.33. However, income in the amount of $70,000.00 per year yields a gross monthly income of $5,833.33, not $5,333.33.[12] The trial court also later stated in its oral reasons for judgment, that it determined Mrs. Texada's gross monthly income to be $5,838.00 per month; however, the amount set forth in the judgment is $5,333.33.[13] Therefore, due to this mathematical error in calculation, we amend the trial court's judgment to provide that Mrs. Texada's income earning potential is $70,000.00, which yields a monthly gross income of $5,833.33.

---

[10] Implicit in the trial court's determination regarding Mrs. Texada's income earning potential was a factual finding that she was voluntarily unemployed or underemployed. See La. R.S. 9:315(C)(5)(b). Mrs. Texada's testimony established that she was a nurse; that the last time she was employed as a full-time nurse, she earned approximately $70,000.00 per year; and that she was currently employed as PRN nurse with her husband's company earning $26,000.00 per year.

[11] Since the parties share equal physical custody of the child, Worksheet B, which is set forth in La. R.S. 9:315.20, is utilized to calculate the child support obligation. See La. R.S. 9:315.9(A)(1) and (B).

[12] $70,000.00 ÷ 12 months = $5,833.33

[13] If there is any conflict between a written judgment and oral or written reasons, the language of the judgment controls. See **Slaughter v. Bd. of Sup'rs of Southern University & Agr. & Mechanical College**, 2010-1049 (La. App. 1st Cir. 8/2/11), 76 So. 3d 438, 459, writ denied 2011-2110 (La. 1/13/12), 77 So. 3d 970.

Turning to Mrs. Texada's assignment of error, utilizing Worksheet B as provided in La. R.S. 9:315.20, the basic child support obligation is calculated as follows. If Mrs. Texada's monthly gross income earning potential is $5,833.33 per month and Mr. Underwood's monthly gross income is $7,627.86, their combined monthly gross income is $13,461.19,[14] with Mrs. Texada's percentage share of that income being 43% and Mr. Underwood's percentage share of that income being 57%.[15] Given the parties' combined monthly gross income of $13,461.19, the child support schedule set forth in La. R.S. 9:315.19 provides for a basic child support obligation of $1,472.00 per month, with a shared custody basic child support obligation of $2,208.00 per month.[16] See La. R.S. 9:315.9(A)(2). Mrs. Texada's theoretical child support obligation would be $949.44,[17] and considering the actual time the child spends with her, *i.e.* 50%, the basic child support obligation she would owe to Mr. Underwood is $474.72.[18] See La. R.S. 9:315.9(A)(2) and (3). Mr. Underwood's theoretical child support obligation would be $1,258.56,[19] and considering the actual time the child spends with him, *i.e.* 50%, the basic child support obligation he would owe to Mrs. Texada is $629.28.[20] See La. R.S. 9:315.9(A)(2) and (3). Offsetting the amount that Mrs. Texada owes to Mr. Underwood, Mr. Underwood owes Mrs. Texada a basic child support obligation of $154.56 per month.[21] See La. R.S. 9:315.9(A)(7). Thus, we agree with Mrs. Texada that the trial court miscalculated the basic child support

[14] $5,833.33 + $7,627.86 = $13,461.19

[15] $5,833.33 ÷ $13,461.10 = 43%; $7,627.86 ÷ $13,461.10 = 57%

[16] $1,472.00 x 1.5 = $2,208.00

[17] $2,208.00 x 43% = $949.44

[18] $949.44 x 50% = $474.72

[19] $2,208.00 x 57% = $1,258.56

[20] $1,258.56 x 50% = $629.28

[21] $629.28 - $474.72 = $154.56

33

obligation. However, we find that the proper basic child support obligation using worksheet B is $154.56, not $191.01 per month, as suggested by Mrs. Texada. Therefore, we amend the trial court's judgment to provide that Mr. Underwood pay child support to Mrs. Texada in the amount of $154.56 per month, retroactive to December 7, 2018.

## 2. Failure to Include the Cost of Health Insurance

Next, with respect to the cost of the child's health insurance premium, we note that throughout these proceedings, Mrs. Texada has always been responsible for maintaining health insurance on the child, that the trial court continued this order in the judgment on appeal herein, and that Mrs. Texada has not challenged the trial court's ruling in that regard. Rather, Mrs. Texada contends that the trial court erred in failing to include the cost of the child's health insurance premium in its calculation of Mr. Underwood's child support obligation.

Louisiana Revised Statutes 9:315.4(A) provides, in pertinent part, that "[i]n any child support case, the court may order one of the parties to enroll or maintain an insurable child in a health benefits plan, policy, or program" and that "[t]he cost of health insurance premiums incurred on behalf of the child shall be added to the basic child support obligation." "'Health insurance premiums' means the actual amount paid by a party for providing health insurance on behalf of the child." La. R.S. 9:315(C)(4). Thereafter, in determining the total child support obligation, each party would be responsible for their percentage share of, among other things, the cost of the child's health insurance premium. See La. R.S. 9:315.2(E), 9:315.4(A), and 9:315.8.

Thus, in general, the cost of the child's health insurance premium is to be added to the basic child support obligation, with each party being responsible for their percentage share of that cost. However, Mrs. Texada, who filed the motion seeking child support and had the burden of proof on the issue, did not offer any

34

evidence as to the cost of the child's health insurance premium. Rather, the only evidence offered was her testimony that her husband paid the child's health insurance premium. Thus, in the absence of any evidence in the record in regard to the actual amount paid by Mrs. Texada (or by her husband) for providing health insurance on behalf of the child, we cannot say that the trial court erred in failing to include that amount in its calculation of Mr. Underwood's child support obligation.

### 3. Deviation from the Child Support Guidelines

Lastly, with respect to child support, the trial court ordered that Mrs. Texada would be responsible for 65% of and Mr. Underwood would be responsible for 35% of the child's private school tuition and that the parties would each be responsible for 50% of the child's non-covered extraordinary medical expenses and expenses for extracurricular activities. Given that, in the calculation of the basic child support obligation, Mrs. Texada's monthly income (or monthly gross income earning potential) was 43% of and Mr. Underwood's monthly gross income was 57% of the parties' combined adjusted monthly gross income, Mrs. Texada maintains the trial court's order with respect to each parties' percentage share of the child's tuition, non-covered extraordinary medical expenses, and expenses for extracurricular activities was an improper deviation from the child support guidelines.

We note that the trial court, in determining the child support obligation in its oral reasons for judgment and in its judgment, also made the factual finding that the Texadas' joint income tax return showed a yearly gross income of $1,204,721.00. The trial court also stated in its reasons for judgment that it considered this income only to the extent that the testimony established that Mrs. Texada's husband paid all of the household bills and that it considered the benefit that Mrs. Texada received from expense sharing when assessing Mrs. Texada's income earning potential. See La. R.S. 9:315(C)(5)(c). The trial court also stated

35

that it further considered the benefit that Mrs. Texada received from expense sharing when deviating from the child support guidelines in its allocation of each party's responsibility for or percentage share of the child's private school tuition. The trial court noted the disparity of the income between the parties' respective households, the parties' desire to have the child continue to attend school at The Dunham School, and Mr. Underwood's testimony concerning his need for financial aid for the child's tuition at Dunham. The trial court further noted that Mr. Underwood did not have the same means or ability to send the child to private school as Mrs. Texada due to the benefit she received from expense sharing with her husband and the income of their household. After considering the benefit Mrs. Texada received from expense sharing, the lack of a need for her to be employed within her household, and the financial circumstances, including the fact that Mr. Underwood sought financial aid for tuition, the trial court determined that it would deviate from the child support guidelines regarding the payment of tuition. The trial court then ordered the continued enrollment of the child in private school and ordered that the cost of the tuition be split 35% to Mr. Underwood and 65% to Mrs. Texada. As to extraordinary medical expenses, *i.e.* those not covered by insurance in excess of $250.00 per year,[22] and other extracurricular expenses the trial court ordered those expenses be split 50% to Mr. Underwood and 50% to Mrs. Texada.

Louisiana Revised Statutes 9:315.1(B)(1) provides:

> The court may deviate from the guidelines set forth in this Part if their application would not be in the best interest of the child or would be inequitable to the parties. The court shall give specific oral or written reasons for the deviation, including a finding as to the amount of support that would have been required under a mechanical application of the guidelines and the particular facts and circumstances that warranted a deviation from the guidelines. The reasons shall be made part of the record of the proceedings.

---

[22] See La. R.S. 9:315.5.

"In determining whether to deviate from the guidelines, the court's considerations may include: ... [a]ny other consideration which would make application of the guidelines not in the best interest of the child or children or inequitable to the parties." La. R.S. 9:315.1(C)(9). "Deviations by the trial court from the guidelines set forth in this Part shall not be disturbed absent a finding of manifest error." La. R.S. 9:315.17.

Notably, the trial court did not deviate from the child support guidelines with respect to the basic child support obligation owed by Mr. Underwood, as detailed above; rather, the deviation related solely to each party's percentage share of particular expenses for the child, *i.e.* expenses for tuition, extracurricular activities, and extraordinary medical expenses. We note that extraordinary medical expenses "shall" be added to the basic child support obligation "[b]y agreement of the parties or order of the court." See La. R.S. 9:315.5. However, expenses for tuition and extracurricular activities "may" be added to the basic child support obligation "[b]y agreement of the parties or order of the court." See La. R.S. 9:315.6(1) and (3).

Based on our review of the evidence presented, we find no manifest error in the trial court's determination that a deviation from the child support guidelines with respect to each party's percentage share of tuition expenses, extracurricular activity expenses, and non-covered extraordinary medical expenses was warranted. As the trial court noted, the evidence established a great disparity between the income of Mr. Underwood and the expenses of the Texada household, which were paid by Mrs. Texada's husband. Mr. Underwood's testimony established that he had recently started his current job and that his base salary was $75,000.00 per year, with an available incentive or performance bonus of $6,250.00 per month. Mr. Underwood had also previously driven for Uber and Lyft in order to earn extra money. Mrs. Texada's testimony established that she was paid approximately

37

$26,000.00 as a PRN nurse by her husband's business. However, she does not work any hours during the week, and it had been over six months since she had taken a call from her husband's business in relation to her PRN nursing duties. Mrs. Texada's testimony also established that her husband paid her percentage share of the child's tuition, as well as the child's health insurance. Mrs. Texada currently resides in a home that was purchased by her husband for $1,200,000.00, and she drives a car provided to her by her husband. Mrs. Texada admitted that, other than groceries and clothing, her husband paid all of the household bills, including electricity, gas, water, cell phone, internet, and cable. In addition, Mrs. Texada was very opposed to and offended by Mr. Underwood's desire to request financial aid for the child's private school tuition.

Considering the discretionary nature of including expenses of tuition and extracurricular activities into the child support obligation and the evidence regarding the benefit Mrs. Texada receives from expense sharing with her husband, we find the trial court's determination that it was more equitable to allocate Mrs. Texada 65% of and Mr. Underwood 35% of the expenses of tuition and to allocate each party 50% of the extracurricular activity expenses is supported by the record. Further, again considering the benefit Mrs. Texada receives from expense sharing, we also find the trial court's determination that allocating of 50% of the non-covered extraordinary medical expenses to each party was equitable and was likewise supported by the record. Accordingly, that portion of the trial court's judgment allocating expenses of tuition 65% to Mrs. Texada and 35% to Mr. Underwood and allocating non-covered, extraordinary medical expenses and extracurricular activity expenses 50% to each party is affirmed.

### C. Contempt

Lastly, on appeal, Mrs. Texada maintains that the trial court erred in finding her in contempt of court for failing to maintain the child on health insurance,

38

failing to fully communicate with Mr. Underwood through Our Family Wizard, and unilaterally changing the times for a telephone call between the child and Mr. Underwood.

A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P. art. 221. There are two kinds of contempt of court: direct and constructive. *Id.* Willful disobedience of any lawful judgment, order, mandate, writ, or process of the court constitutes a constructive contempt of court. La. C.C.P. art 224(2).

To find a person guilty of constructive contempt, the court must find that he or she violated the order of the court intentionally, knowingly, and purposely, without justifiable excuse. **Rogers v. Pastureau**, 2012-2008 (La. App. 1st Cir. 4/26/13), 117 So.3d 517, 532, writ denied, 2013-1833 (La. 8/8/13), 120 So.3d 247. If the person charged with contempt is found guilty, the court shall render an order reciting the facts constituting the contempt, adjudging the person charged with contempt guilty thereof, and specifying the punishment imposed. La. C.C.P. art. 225(B). The trial court is vested with great discretion in determining whether a party should be held in contempt of court and its decision will be reversed only when the appellate court discerns a clear abuse of that great discretion. **Rogers**, 117 So.3d at 532.

The punishment which a court may impose upon a person adjudged guilty of contempt of court is provided in La. R.S. 13:4611. La. C.C.P. art 227. Pertinent to the contempt charges at issue herein, La. R.S. 13:4611(1)(d) provides that the trial court may punish a person adjudged guilty of a contempt of court by a fine of not more than five hundred dollars, or imprisonment for not more than three months, or both. In addition to or in lieu of those penalties, the trial court may also order

the payment of all court costs and attorney fees incurred by the other party. La. R.S. 13:4611(1)(e)(iv).

First, with respect to the child's insurance, the stipulated judgment (as well as the first and second considered decrees) ordered Mrs. Texada to maintain the child on a policy of health insurance. During Mrs. Texada's testimony, she acknowledged that it was her responsibility to carry health insurance coverage on the child. Mrs. Texada admitted that during 2017, the child was without health insurance for approximately seven days in July 2017 (July 1-July 7), for three days in August 2017 (August 7-August 9), and for two days in September 2017 (September 9-September 10). Although Mrs. Texada stated that the lapse in coverage was "not done maliciously or intentional[ly]," she provided no explanation other than "there might have been a gap in renewing it" or "maybe [the insurance company] had a waiting period." Based on this evidence, the trial court found Mrs. Texada in contempt of court for failing to maintain insurance on the child as previously ordered.

Next, with respect to communications through Our Family Wizard, the interim judgment, the first considered decree, and the second considered decree ordered the parties to communicate with each other regarding the child by using Our Family Wizard. These provisions were not modified by the terms of the stipulated judgment, and therefore, remained in effect. The record before us contains evidence of several instances where Mrs. Texada either failed to respond to messages that Mr. Underwood sent via Our Family Wizard or waited an extended period of time before opening or responding to the messages. For example, on one occasion, Mr. Underwood sent Mrs. Texada an email through Our Family Wizard requesting the child's passport, which was in Mrs. Texada's possession, for a vacation that he planned. Although Mrs. Texada read the email, she waited ten days until she responded to Mr. Underwood's request and was

unable to provide any explanation for her delayed response. In addition, we note Leslie Todd testified that the parties were supposed to be providing each other weekly updates about the child through Our Family Wizard when the child was in each their physical custody, that Mr. Underwood had provided such communication to Mrs. Texada, but that Mrs. Texada did not want such communication. Based on this, as well as other evidence offered at trial, the trial court found Mrs. Texada in contempt for failing to "communicate fully in Our Family Wizard as was ordered by the court."

Lastly, with respect to the telephone access to the child, the second considered decree specifically provided that the parent who did not have physical custody of the child would be allowed to talk to the child by telephone, with the party having physical custody of the child being required to answer the telephone and to tell the child that the other parent was on the telephone. This provision of the second considered decree was not modified by the stipulated judgment, and therefore, it remained in effect. This provision did not set specific times within which the parties were allowed to speak to the child while in the other party's care. According to Mrs. Texada's testimony, she decided to set up a schedule for Mr. Underwood and the child to talk on the telephone when the child was in her custody. More specifically, she set the schedule up for 4 p.m. on weekdays and 9 a.m. on weekends. Mr. Underwood explained at trial that the 4 p.m. time on weekdays was not always convenient for him due to his work schedule. However, when Mr. Underwood objected to Mrs. Texada's call schedule because it was not part of the judgment, Mrs. Texada simply informed Mr. Underwood of the rule that there would be a call schedule when the child was in her custody. Mrs. Texada admitted that if Mr. Underwood missed the telephone call at the time that she scheduled and if Mr. Underwood attempted to call back at a later time, she would not answer the telephone, and Mr. Underwood would not be able to talk to the

41

child. Based on this evidence, the trial court found Mrs. Texada in contempt of court for her decision to "unilaterally and arbitrarily" change (or set) the times for the child to have telephone contact with Mr. Underwood, resulting in Mrs. Underwood being unable to talk to the child.

The trial court, after making these three specific findings of contempt on the part of Mrs. Texada, did not impose any punishment, fine, or sentence on Mrs. Texada. See La. C.C.P. art. 225(B); La. R.S. 13:4611(1)(d). Although the trial court did order that Mrs. Texada would be responsible for all of the medical bills incurred on behalf of the child during the periods of time that he was not covered by health insurance, the record reflects that no such medical expenses were incurred during those periods of time. Furthermore, the trial court did not award Mr. Underwood any court costs or attorney fees that he incurred in bringing the contempt motions. See La. R.S. 13:4611(1)(e)(iv). Rather, because the trial court also found Mr. Underwood in contempt of court, i.e. for failing to utilize Our Family Wizard and for failing to co-parent and exercise flexibility in the custodial schedule, the trial court declined to award either party costs or attorney's fees.

Based on our review of the record, we find no abuse of the trial court's vast discretion in finding Mrs. Texada in contempt of court for failing to maintain health insurance on the child, failing to fully communicate with Mr. Underwood through Our Family Wizard, and unilaterally changing the time for the child and Mr. Underwood to talk on the telephone. The record reflects that it was Mrs. Texada's responsibility to maintain the child on health insurance and that the child was without health insurance for twelve days in 2017. Furthermore, these twelve days did not occur consecutively nor did the lapse occur on one occasion. Rather, Mrs. Texada allowed the child's health insurance to lapse three different times over the course of three months in the same year. The record also reflects that Mrs. Texada failed to fully communicate with Mr. Underwood via Our Family Wizard

and that she unilaterally set and enforced a call schedule between Mr. Underwood and the child when the child was in her care, which often resulted in Mr. Underwood not being able to talk to the child while he was in Mrs. Texada's care. Furthermore, the trial court did not impose any of the punishments on Mrs. Texada that it could have imposed pursuant to La. R.S. 13:4611(1)(d)-(e), *i.e.* a fine and/or imprisonment and an award of attorney's fees and costs in favor of Mr. Underwood. Thus, we cannot say that there was any abuse of the trial court's vast discretion with regard to its rulings on contempt of court by Mrs. Texada.

## III. CONCLUSION

For all of the above and foregoing reasons, the September 9, 2020 judgment of the trial court is amended to delete all references to domiciliary parent, to provide that Mrs. Texada's income earning potential is $70,000.00, which yields a monthly gross income of $5,833.33, and to provide that Mr. Underwood pay child support to Mrs. Texada in the amount of $154.56 per month, retroactive to December 7, 2018. In all other respects, the judgment is affirmed. All costs of this appeal are assessed to the appellant, Leigh Ann Texada.[23]

**AMENDED AND AFFIRMED AS AMENDED.**

---

[23] We note that the amendment of the trial court's judgment herein to remove all references to domiciliary parent was a legal error that affected both parties, and that the amendment in regards to child support were errors in calculation that could have been corrected in the trial court. See La. C.C.P. art. 1951. Therefore, we assess all costs of this appeal, which affirmed the trial court's judgment in all other respects, to Mrs. Texada. See La. C.C.P. art. 2164.